DeMARCO AND DeMARCO, Ex'rs of the Estate of
Salvatore J. DeMarco, Jr., ET AL. *v.*
DeMARCO

[No. 366, September Term, 1970.]

*Decided April 8, 1971.*

The cause was argued before HAMMOND, C. J., and
FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Robert J. Thieblot* and *Russell C. Milburn,* with whom
were *Allen, Thieblot & Alexander* and *Faby & Milburn*
on the brief, for appellants.

*J. M. Dryden Hall, Jr.*, with whom were *Baldwin, Jarman & Norris* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

Judge Shirley Jones, sitting without a jury, gave judgment as asked by Charles A. DeMarco (Chuck) for $11,-736.40, the balance due and unpaid for his services as an architect in preparing plans for the renovation and enlargement of Hillcrest Nursing Home, Inc., all the stock of which was owned by its president, Dr. Salvatore J. DeMarco, Jr., Chuck's cousin. The judgment was against the corporation, which did not appeal, and, Dr. DeMarco having died before trial, against his executors (his son and his widow, Elsin DeMarco, now by remarriage Elsin Andrews), and against Elsin DeMarco Andrews, individually, who have appealed.

In the fall of 1965 Dr. DeMarco was recuperating from a heart attack at his home on Greenway in Baltimore. In an effort to ease the doctor's boredom, Mrs. DeMarco proposed to revive an earlier attempt, unsuccessful because of zoning problems, to enlarge the nursing home. She asked Chuck, who is an architect, to come to the Greenway house to talk to the doctor and her about the matter. Chuck testified that at this meeting he was hired to do the architectural work for the renovation and enlargement of the nursing home at a fee of 6% of the cost, a fee he made lower than the standard A.I.A. fee because of the family relationship. A number of subsequent meetings were had at which Chuck and Dr. and Mrs. DeMarco were present. The first estimate of cost was $300,-000 to $350,000. Gradually the scope and the size of the project were increased and the estimate rose to $450,000. When the bids were opened, the low bid was $584,000. Finally, the bid of the low bidder was renegotiated to $499,000, apparently because a corporate lender had tentatively agreed to lend $500,000, and Dr. and Mrs. DeMarco approved its acceptance. Chuck attempted to arrange permanent financing, was unsuccessful, and the

work was never done. The land under the nursing home was owned by Dr. DeMarco and the plan had been that it would be conveyed to Hillcrest in return for stock and Hillcrest would mortgage the property in order to pay for the construction and attendant costs.

Hillcrest had neither actual nor paper corporate meetings subsequent to its organization meeting in January 1959. Chuck knew nothing of Hillcrest's corporate or financial status. He dealt only with the DeMarcos. As far as he knew, he said, Hillcrest could have been insolvent. In January 1966 he handed Mrs. DeMarco an envelope and, according to her testimony, told her it contained a standard architectural form agreement and to "get Bill [Dr. DeMarco] to sign it." The envelope also contained a letter requesting that the form be signed by both Dr. and Mrs. DeMarco and returned together with a payment on account of the final fee of $1,050. The contract never was signed and the $1,050 was not paid. Chuck completed the design development phase of the plans in May 1966 and sent a bill to Dr. DeMarco at his home, calling for a progress payment of $7,350. Mrs. DeMarco telephoned Chuck and told him, he says, that for "tax purposes" the bill should be sent to Hillcrest. Mrs. DeMarco's version was that she told Chuck he must look to Hillcrest for payment, not Dr. DeMarco or her. Chuck says that he thought the DeMarcos were joint owners of all their property, including Hillcrest, because the Doctor had told him that was the way to hold property, and "would have billed the Pope" if they had asked him to.

Mrs. DeMarco prepared a check on Hillcrest's bank account from a batch of checks they kept at home (Hillcrest's bills were not customarily paid in this fashion). Dr. DeMarco signed it and Mrs. DeMarco sent it in the amount of $7,350 to Chuck. On December 5, 1966 Chuck wrote Dr. DeMarco that the estimated construction costs had gone to probably $450,000, that he had recalculated the basis of his fee and asked for a progress payment of $5,850. At the same time he sent an invoice for that amount to Hillcrest, as Mrs. DeMarco had requested him

to do. In April 1967 Chuck received a Hillcrest check, prepared as before, this time in the sum of $5,474.16, computed as a payment on account of $5,000 plus reimbursement to Chuck of $474.16 which he had expended for blueprints.

On August 1, 1967, after the financing fell through and the project died, Chuck sent a letter to Dr. DeMarco's home, addressed both to him and Hillcrest, which recited that Chuck had earned a fee of $24,086.40 and had been paid but $12,350, leaving a balance due of $11,736.40 (the amount for which Judge Jones gave judgment to Chuck) which he would like to be paid. At trial there was a stipulation that the immediate past president of the Maryland Chapter of the American Institute of Architects and a practicing architect, stipulated to be a qualified expert, would say that the reasonable value of the professional services performed by Chuck was $24,086.40.

In this Court the appellants argue that the admissible evidence did not support the finding that Mrs. DeMarco was personally responsible for Chuck's bill and, since she could not permissibly be held personally, the testimony as to her involvement should not have ultimately been considered in deciding Dr. DeMarco's liability, and that Judge Jones erred prejudicially in refusing to apply the Dead Man's Statute, Code (1965 Repl. Vol.), Art. 35, § 3, to Chuck's testimony.

Judge Jones found that Chuck was retained by both Dr. DeMarco and Mrs. DeMarco to perform the services he rendered and that they intended to pay him a reasonable fee for his services. She found too that "Charles' [Chuck's] services were accepted by the DeMarcos through the bidding stage of the project * * *. That the project did not reach the actual construction stage does in this case defeat Architect's claim for a reasonable fee for his services." Judge Jones further found that both DeMarcos were liable for a fee of 6% of the construction costs either because they had orally agreed expressly to pay 6% or because they had knowingly and intentionally accepted Chuck's services, and the undisputed evi-

dence was that the reasonable value of those services was the same 6% of the construction cost.

We think that the admissible probative evidence permitted the findings Judge Jones made. Mrs. DeMarco was asked about the "agreement." She answered: "[i]t was just between the three of us" and that "Chuck, and Bill [Dr. DeMarco], and I were talking." She said on the stand flatly: "My husband and I expected to pay him a reasonable fee when the project was completed." She said that "we" (meaning Dr. DeMarco and herself) incorporated Hillcrest and that the land owned by Dr. DeMarco was to become security for the loan that would pay Chuck's fee.

We find no prejudicial error in the rulings under the Dead Man's Statute. Judge Jones refused to permit Chuck to testify as to statements by or transactions with Dr. DeMarco but permitted him to testify as to statements of and transactions with Mrs. DeMarco, even though when the statements were made or the transactions had Dr. DeMarco was always or almost always present. Nevertheless, when counsel for the estate and Mrs. DeMarco took Chuck on cross-examination they purposefully elicited from him the very answers they had successfully kept out on direct against Dr. DeMarco. Section 3 of Art. 35 of the Code provides inter alia that in an action against an executor "no party to the cause shall be allowed to testify as to any transaction had with, or statement made by the testator * * * unless called to testify by the opposite party." This Court has ruled in various cases that an adverse party who is cross-examined in regard to a transaction with the deceased has been "called to testify by the opposite party" and may testify as to what he could not testify unless so called. *Stacy v. Burke,* 259 Md. 390, 405; *Leahy, Executrix v. McManus,* 237 Md. 450, 455-456; *Cooper v. Davis,* 226 Md. 371, 375; *Heil v. Zahn,* 187 Md. 603, 606. Chuck's testimony on cross-examination, if believed by the trier of fact as obviously it was, was enough, taken with Mrs. DeMarco's

testimony, to sustain the finding that Dr. DeMarco and Mrs. DeMarco were individually liable.

*Judgments affirmed, with costs.*