STACY *v.* BURKE, Executor under the will of
Erle Edwards Stacy

[No. 55, September Term, 1970.]

*Decided October 22, 1970.*

*Motion for rehearing filed November 12, 1970; denied and opinion modified November 16, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Robert A. Wallace,* with whom was *George L. Quinn, Jr.,* on the brief, for appellant.

*James T. Barbour* for appellee.

BARNES, J., delivered the opinion of the Court.

The two principal questions in this appeal are whether the Circuit Court for Montgomery County (Shook, J.) in a suit by a decedent's executor to declare a constructive trust on certain property of the decedent in the hands of the appellant erred (1) in declining to admit two documents signed by the decedent in regard to alleged gifts of the property and (2) in withdrawing its original order ruling for the defendant and entering a second order ruling for the plaintiff, executor, after the plaintiff (appellee) had already filed an appeal to this Court from the initial order.

The basic facts are substantially undisputed. Erle Edwards Stacy, the decedent (Uncle Erle) died on January 23, 1969, at the age of 88 in a nursing home in Wheaton, Maryland. He was a widower at the time of his death. He had no children. His only surviving heirs were a brother and the children of a deceased brother Arthur Stacy. The appellant, Erle M. Stacy (Nephew Erle), who was the defendant below, was one of the children of the

deceased brother Arthur and was named for his Uncle Erle.

Uncle Erle was an educated person who had graduated from William and Mary College in 1901. He became a professor of mathematics at William and Mary College and at the University of Texas.

There was a close business relationship between Uncle Erle and his brother Arthur. Uncle Erle had founded a plumbing, heating and roofing contracting business in Washington, D. C. in 1907. He operated it himself until 1921 when his brother Arthur joined him as a partner. Together they operated the business until 1932 when Arthur bought out his brother's interest in the business. Uncle Erle, however, never lost interest in the business; and whenever Nephew Erle, who was employed in the business, visited his Uncle Erle, he always inquired about collections and other relevant business matters. After Nephew Erle acquired and operated the business, Uncle Erle's interest in it continued. The relationship between Uncle Erle and his Nephew Erle was a close one and Uncle Erle was interested in his nephew's progress and welfare.

Uncle Erle's wife, Bertha, died on January 4, 1967, leaving him alone in their home in Arlington, Virginia. Nephew Erle obtained a housekeeper for his uncle; but after four months, Uncle Erle desired to move to Maryland and thereafter did move to Montgomery County to a nursing home where he could be close to Nephew Erle and his family as well as to his brother William. The Arlington house was closed and remained vacant for approximately one year.

Thomas F. Burke was a co-executor and a co-trustee with his Uncle Erle under Bertha's will. Shortly after Bertha's death on January 4, 1967, Thomas F. Burke, who had represented Uncle Erle from time to time, met Uncle Erle and Nephew Erle at the Riggs National Bank in Washington, D. C., where Uncle Erle and his wife had their bank accounts, and assisted in obtaining a power of attorney for Nephew Erle so that he could draw funds from Uncle Erle's account to pay bills. On February 22,

1967, Uncle Erle executed a general power of attorney with broad powers. This general power of attorney was duly witnessed by a notary public who took Uncle Erle's acknowledgement of the power of attorney.

On April 5, 1967, when Uncle Erle moved to Montgomery County, he signed a letter offered in evidence by Nephew Erle, but not admitted into evidence by the trial court. The letter read as follows:

"April 5, 1967

"Dear Erle:

"Along the lines of our previous discussion, please place the proceeds from the sale of my home in Arlington in one or more joint savings accounts, using my name and yours.

"I intend that you have full ownership of these funds should I predecease you and that they shall not in any way be considered as a part of my estate.

"I truly appreciate all of the time and effort you are devoting to help get my affairs in order.

"Affectionately yours,
/s/ Uncle Erle
/s/ Erle E. Stacy"

After the Arlington house was sold but prior to the settlement and distribution of the proceeds of sale, Uncle Erle, on December 6, 1967, signed a document which read as follows:

"December 6, 1967

"TO WHOM IT MAY CONCERN:

"I have asked my nephew, Erle M. Stacy, to write these instructions for my signature so that he may act legally in conducting my business and financial affairs; while acting under the General Powers of Attorney I previously gave to him:

"1. In keeping with our prior understanding I have agreed that he should pay to himself forty

dollars ($40.00) per month for his services to me.

"2. I want the money from the sale of my Arlington house in his name alone. It is my wish that he have these funds.

"3. I have instructed him to purchase shares in the B. F. Saul Co. Investment Trust. The shares to be purchased from the proceeds from principal payments of first trust notes that I own. These shares are to be made out in our joint names, with the right of survivorship.

"4. These instructions have been discussed with my nephew and have been carefully read by me. Accordingly I sign my name.

/s/ Erle Edwards Stacy"

This document was offered in evidence by Nephew Erle but was not admitted by the lower court into evidence.

It was stipulated that the signatures of Uncle Erle on the letter of April 5, 1967, and the document of December 6, 1967, were genuine—and written by Uncle Erle. The evidence indicates that Uncle Erle was mentally alert during all times relevant in the present case and there is no contention that he was mentally incompetent at such times.

Beginning December 7, 1967, Nephew Erle drew checks through September 10, 1968, on Uncle Erle's account in a total amount of $23,944.93 payable to B. F. Saul Company for the purchase of B. F. Saul Real Estate Investment Trust shares of stock registered in the joint names of Uncle Erle and Nephew Erle as joint tenants with the right of survivorship.

On March 15 and 20, 1968, Nephew Erle drew checks on Uncle Erle's account in a total amount of $25,480.00 which was deposited in the name of Nephew Erle alone or in the joint names of Nephew Erle and his wife Virginia. These funds were the proceeds from the sale of the Virginia house of Uncle Erle.

Two checks for $1,926.00 and for $2,000.00 were drawn

by Nephew Erle to A. A. Stacy & Son, Inc. on June 14, 1967, and August 22, 1968, respectively, as loans to that corporation. The $1,926.00 loan has been repaid by the corporation; the $2,000.00 loan was unpaid at the time of the hearing and was due and owing to the executor of Uncle Erle's estate. If the corporation has not paid the $2,000.00 to the executor when the mandate in this case is returned to the lower court upon the remand, the executor may proceed to collect this debt due the estate, and the mandate is without prejudice to such collection.

At the hearing before the lower court on October 16, 1969, in addition to Nephew Erle, his wife Virginia and Mr. Burke, the appellee, Nephew Erle's brother William and his mother Essie Mae Stacy, testified.

William confirmed the close and affectionate relationship between his Uncle Erle and his uncle's namesake, Nephew Erle. He testified in regard to the kind of a person his Uncle Erle was, as follows:

> "He was a person of very strong English type tradition on family ties who considered himself to be the patriarch of the family upon the demise of his father, my grandfather, and the leader of the family and one who was very concerned with all the workings of the family, the social, religious and business and financial workings."

Nephew Erle's mother Essie Mae, testified, without objection, that she saw Uncle Erle several times a week when he was in a nursing home. In the latter part of January 1968 she had a conversation with him as follows:

> "I don't know the date that was, just the last of January and we went out into the living room and talked for quite a while. And, as usual, he was asking about Erle M., my son, and then he got around to the subject of his house in Arlington. He mentioned he would be so glad when it was sold; that he didn't want the house stand-

ing vacant. He said to me, 1 expect to give Erle the proceeds from the sale of the house in appreciation for what he's done for me. He also said that he, having been in the business himself for so long, realized that Erle had all he could do to managing his own business without the extra responsibility of taking care of his, Erle E's financial and personal affairs. In appreciation he was going to give Erle the proceeds from the sale of the house in Arlington."

Essie Mae saw Uncle Erle several times after January 1968 and had a conversation with him on June 6, 1968. She testified that he told her the same things he had told her before. The conversation continued as follows:

"He said also I have instructed him to take the money that has accumulated from the paid-up first trust notes that I have with B. F. Saul, the principal, my shares in the real estate mortgage investment fund of Saul Company, and I have also instructed him to use my name, Erle E. Stacy, and Erle M. Stacy's name as joint tenants with rights of survivorship and buy the certificates with it."

\* \* \*

"As I said, the first conversation was in January, when we were sitting out in the living room or lobby and, as usual, he asked about Erle M., my son, and the business."

\* \* \*

"Q. What did he say? A. He said, I know from experience Erle has all he can do to manage the plumbing and heating business and take care of himself. He said I feel very keenly how busy he is and I appreciate more than I can say his having enough interest in me to take care of my personal affairs and my financial affairs. He said I do appreciate it and he said I'm going

to give Erle the proceeds from the sale of the house.

"Q. Are you sure that is what he said, 'I'm *going to give* Erle the proceeds of the house?' A. Yes, at that time. (Emphasis added)

"Q. Did you ever talk to him again about the proceeds from the house? A. Yes, sir.

"Q. When? A. The 6th of June 1968.

"Q. What did he say at that time? A. He said at that time, I *have given* Erle the proceeds from the sale of the house. (Emphasis added)

"Q. What else did he say? A. He said also I have authorized Erle to take the money from the notes which have been paid, the principal which has been paid and accumulated and buy shares in the B. F. Saul Real Estate Mortgage Investment Trust Company and also to sign my name, Erle E. Stacy, and Erle M. Stacy as joint tenants with right of survivorship.

"Q. What does that mean; do you know? A. *Yes, I know. Whichever one survives the other the money goes to them.* (Emphasis added)

"Q. The money? A. The shares.

"Q. How do you know that? A. Because I have had experienced it myself. I make investments with Saul Company.

"Q. Do you own shares? A. I own a few shares and so did my husband. The Stacy family has been doing business with Saul Company for the last forty years."

No copy of Uncle Erle's will was offered into evidence and no evidence was offered in regard to the amount of his estate. In the verified answer of Nephew Erle, it was recited that the Mt. Vernon Place Methodist Church had been made residuary legatee and Mr. Burke had been made executor, contrary to a prior will made some months before. It was stated at the argument, without contra-

diction, that Uncle Erle's estate was valued at approximately $70,000.00 which did not include the gifts of $25,-480.00 and $23,944.93 to Nephew Erle.

Legal memoranda were submitted by both parties and the lower court took the case under advisement. On December 23, 1969, the Chancellor filed an opinion and order dismissing the bill of complaint. Copies were mailed to counsel for the respective parties. In the opinion the Chancellor stated, *inter alia*:

> "The testimony of Mrs. Essie Mae Stacy, mother of the defendant and sister-in-law of the decedent, was clear and convincing as to the voluntariness of the decedent's intention and the ultimate consummation of the gift some months later. Plaintiff has in no way controverted this evidence. It is noted, too, that these discussions between Mrs. Stacy and the decedent occurred in January and June 1968 and the period between the declaration of the decedent's intention to give the defendant the proceeds from the sale of the house and the date when he affirmed the action, certainly was sufficient for decedent to reflect adequately as to the wisdom of his deed."

After reviewing the applicable law, the Chancellor stated:

> "Accordingly, this court is of the opinion that there could have been a confidential relationship between the decedent and defendant but that such relationship did not extend to the subject matter of the gift and further, that the defendant in no way breached any fiduciary responsibility by inducing or influencing his uncle to make the defendant a gift of the proceeds of the sale of decedent's home."

In regard to the gift of money to purchase the shares of B. F. Saul Investment Trust, and placing them in the

joint names of Uncle Erle and Nephew Erle with the right of survivorship, the Chancellor stated:

> "The donative intent has previously been expressed in the testimony of Mrs. Stacy and need not be belabored further."

The Chancellor concluded that this was a "valid *inter vivos* gift" to Nephew Erle.

From the order of December 22, 1969 (filed December 23, 1969), dismissing the bill of complaint, the plaintiff below and appellee here, filed an appeal to this Court on January 6, 1970, and filed a supersedeas bond, duly approved, at the same time. Later in the day of January 6, after the appeal to this Court had been filed, the Chancellor, apparently *sua sponte,* ordered the reporter to furnish the testimony in the case and passed an order withdrawing the opinion and order filed on December 23, 1969.

Thereafter, on February 16, 1970, the Chancellor filed another opinion and decree in which the following was stated:

> "It, therefore, follows that the burden of presenting clear and convincing proof that the funds of the decedent taken by the defendant were intended to be an *inter vivos* gift must be borne by Erle M. Stacy. Such burden of proof must be sufficient to overcome the presumption of the invalidity of the gift as between a fiduciary and principal. This, the defendant has not done. The only evidence to corroborate defendant's claim is that of Essie Mae Stacy, mother of the defendant. This evidence is unclear as to time of the making of the gift, uncertain as to the corpus of the gift and insufficient to prove the elements of a gift.
>
> "This Court can only conclude that because of the lack of evidence to support the validity of the alleged gifts, they are, therefore, facially

void and such funds as enumerated herein right-
fully belong to the estate of the decedent."

The Chancellor thereupon passed a decree that "the
equitable relief prayed for by the plaintiff be and it is
hereby granted."

From this decree, Nephew Erle, the defendant below
and appellant here, took an appeal to this Court on March
10, 1970.

### (1)

We will first consider the unusual posture in which the
case reaches us. It will be observed that the appeal from
the lower court's order of December 22, 1969, (filed De-
cember 23, 1969) has not been withdrawn or abandoned
by the plaintiff and present appellee, Burke, Executor.
He explains his reasons for this in his brief as follows:

"Because of uncertainty of the jurisdiction of
the trial Court to withdraw, sua sponte, on Jan-
uary 6, 1970, its Opinion and Order of Decem-
ber 23, 1969, Appellee did not withdraw his No-
tice of Appeal filed on January 6, 1970. The sec-
ond Opinion and Order was filed more than
thirty days after the Opinion and Order of De-
cember 23, 1969. Conceivably, it might be held
that the withdrawal of the Opinion and Order
of December 23, 1969 was beyond the power of
the trial Court to do so and a withdrawal of the
Appellee's Notice of Appeal might have resulted
in the Opinion and Order of December 23, 1969
becoming the law of the case and dispositive of
the rights of the Appellee. To be certain, there-
fore, that the rights of the Appellee were pro-
tected, the Notice of Appeal from the Opinion
and Order of December 23, 1969, filed on Jan-
uary 6, 1970, was allowed to remain on the
docket. Appellee is in full agreement with the
conclusions of the Opinion and Order of Feb-
ruary 17, 1970, and it is the contention of the
Appellee that the Order filed on the last men-

tioned date correctly disposes of the issues in this case, although it may be necessary to supplement the same in order to carry it into effect." [1]

We are not unmindful of the dilemma in which the appellee found himself, but the law is well settled that ordinarily, the trial court's jurisdiction is ended upon the filing of an appeal to this Court.

In a case involving the filing of a second motion for a new trial after an appeal had been entered from the judgment in a tort case, Judge Horney, for the Court, in *Vancherie v. Siperly*, 243 Md. 366, 375, 221 A. 2d 356, 361 (1966) aptly stated:

"* * * an appeal having been entered, the lower court lacked jurisdiction to take any further action in the case with respect to the subject matter of the appeal until the receipt of the mandate from this Court after the appeal had been heard and decided. This is so because the perfection of the appeal brought the subject matter of the appeal within the exclusive jurisdiction of this Court and suspended the authority of the lower court over it during the pendency of the

1. The second prayer for relief seeks both a temporary and permanent injunction against two of the defendants, Perpetual Building Association and Citizens Building and Loan Association. Maryland Rule BB78 provides that an "order granting an injunction shall set forth the reasons for its issuance; shall be specific in terms; and shall describe in reasonable detail, and not by reference to the complaint or other document, the act sought to be required or commanded or restrained or forbidden." The decree of February 16, 1970, merely decrees that "the equitable relief prayed for by the plaintiff be and it is hereby granted," and obviously does not comply with the mandatory provisions of Rule BB78 so far as injunctive relief is concerned. Then, too, the other prayers for relief seek an accounting from the defendant for all money and property he acquired from the decedent; an order directing the defendant to pay to the executor funds deposited in the two building and loan associations which had belonged to the decedent; an order directing the transfer of the B. F. Saul Real Estate Investment Trust shares to the executor and for other relief, which would no doubt include an order that the defendant pay the costs. The decree of February 16, 1970, as indicated, does not decree specific relief in regard to any of these matters.

appeal. See *State v. Jacobs,* 242 Md. 538, 219 A. 2d 836 (1966) ; *Gilliam v. Moog Industries,* 239 Md. 107, 210 A. 2d 390 (1965) ; *Bullock v. Director,* 231 Md. 629, 190 A. 2d 789 (1963). The defendant could, of course, have dismissed the appeal and moved for a revision of the judgment pursuant to Rule 625."

See also *Tiller v. Elfenbein,* 205 Md. 14, 19, 21, 106 A. 2d 42, 44, 45 (1954) in which Judge (later Chief Judge) Henderson carefully reviewed the prior Maryland cases. This was an appeal in a tort case involving a motion for a reargument filed within 30 days after the entry of judgment but after an appeal to this Court had already been entered. The appeal, however, was *dismissed before the hearing* on the motion. The Court stated:

"Ordinarily, the trial court's jurisdiction is ended upon the filing of an appeal."

\* \* \*

"We hold that, unless the appeal is dismissed when the motion comes on for hearing, the appellant must elect between his motion and his appeal. If the appeal is dismissed before the hearing, as in the instant case, the motion stands for hearing as though no appeal has been entered."

As we have stated the appellee has not dismissed his appeal from the order of December 22, 1969 (filed December 23, 1969); for reasons already set forth, and the appellant has not moved to dismiss the appeal from the order and decree of February 17, 1970, possibly believing that the ultimate issues in the case could be resolved by us under *his appeal* from that order and decree. In our opinion, however, the Chancellor had no power to revoke the order of December 23, 1969, because an appeal from the order had already been entered and was not withdrawn within 30 days of the date of the order to enable him to invoke the provisions of Rule 625. Even

though this question was neither briefed nor argued, it may be raised by this Court, *sua sponte*, as an exception to the general rule established by Maryland Rule 885 because it is a jurisdictional matter. *Webb v. Oxley*, 226 Md. 339, 173 A. 2d 358 (1961). See *Tate v. State*, 236 Md. 312, 316, 203 A. 2d 882, 884 (1964).

Although we are of the opinion that the Chancellor was generally correct in the first opinion filed on December 23, 1969, we consider the denial of admission into evidence of the letter of April 5, 1967, and the document of December 6, 1967, to have been improper for reasons hereinafter set forth. In view of the peculiar posture of the case, we conclude that we should reverse the decree of February 17, 1970, and remand the case for further proceedings in accordance with this opinion, rather than merely dismiss the appeal from that decree.

### (2)

We now come to a discussion of what, in our opinion, was the erroneous action of the Chancellor in refusing to admit into evidence the letter of April 5, 1967, and the document of December 6, 1967, both of which have been fully set forth above.

The Chancellor sustained the objection of the plaintiff executor on the ground that both papers were "transactions with a decedent" and hence were not admissible in evidence by virtue of the provisions of Code (1957), Art. 35, § 3, the "Dead Man Statute." We do not agree with this conclusion.

Art. 35, § 3 of the Maryland Code provides in relevant part:

> "In actions or proceedings by or against executors, administrators, heirs, devisees, legatees or distributees of a decedent as such, in which judgments or decrees may be rendered for or against them, and in proceedings by or against persons incompetent to testify by reason of mental disability, no party to the cause shall be allowed to testify as to any transaction had with,

or statement made by the testator, intestate ancestor or party so incompetent to testify, either personally or through an agent since dead, lunatic or insane, unless called to testify by the opposite party, or unless the testimony of such testator, intestate, ancestor or party incompetent to testify shall have already (been) given in evidence, concerning the same transaction or statement, in the same cause, on his or her own behalf or on behalf of his or her representative in interest; * * *"

This Court has held that this statute, as an exception to the policy enumerated by Code (1957), Art. 35, § 1 that witnesses should not be excluded from giving evidence by reason of interest, should be rather narrowly construed. As Judge (later Chief Judge) Henderson stated for the Court in *Shaneybrook v. Blizzard,* 209 Md. 304, 309, 310, 121 A. 2d 218, 220-221 (1956) :

"This section must be read in the light of sec. 1, which provides generally that witnesses shall not be excluded from giving evidence by reason of interest, 'except as hereinafter excepted'. The statute was first enacted by Ch. 109, Acts of 1864. In its original form the exception applied 'when an original party to a contract or cause of action is dead, * * *'. By Ch. 495, Acts of 1902, the exception was expressed in its present form, with amendments not here material by Ch. 661, Acts of 1904. The Act of 1864 was obviously designed to remove the common law disqualification of witnesses, especially parties litigant, for interest. Almost all of the numerous Maryland cases dealing with the subject have dealt with matters of contract, express or implied, between the survivor and a decedent. Generally speaking, the exception has been rather narrowly construed. Cf. *Smith v. Humphreys,* 104 Md. 285, 289; *Horner v. Frazier,* 65 Md. 1,

10; *Russell v. Carman,* 114 Md. 25, 35; and *Sheeler v. Sheeler,* 207 Md. 264, 269."

The statute does not make the party in an action to which the statute applied incompetent as a witness for all purposes but only in regard to "any transaction had with or statement made by" the decedent. Even in regard to this limited area, the party may give testimony if called by the opposite party as the statute provides. We have held that an adverse party who is *cross-examined* in regard to a transaction with the decedent has been "called to testify for the opposite party" and, therefore, the answers of such a party are admissible under the express provisions of the statute. *Leahy v. McManus,* 237 Md. 450, 206 A. 2d 688 (1965) and *Cooper v. Davis,* 226 Md. 371, 174 A. 2d 144 (1961).

There is little question that Nephew Erle was a party in an action in which the executor of Uncle Erle was a party and could not testify in regard to the conversations or transactions with Uncle Erle in connection with the gifts to Nephew Erle. The letter of April 5, 1967, and the document of December 6, 1967, would have been admissible against Uncle Erle as admissions against interest if he had been living and had sought to set aside the gifts. The parties in their written Stipulation of Facts, stipulated that the signatures appearing in the letter and the document were "genuine and were written by the said deceased, Erle Edwards Stacy." Thus the papers were, prima facie, valid and effective as admissions against interest. See *Mannix v. Baumgardner,* 184 Md. 600, 42 A. 2d 124 (1945); *McBriety v. Phillips,* 180 Md. 569, 574, 575, 26 A. 2d 400, 404 (1942) and 31A C.J.S. *Evidence* § 283.

Nephew Erle by identifying them was not testifying in regard to any transaction had with or statement made by Uncle Erle. See *Herbert v. Lankershim,* 9 Cal. 2d 409, 71 P. 2d 220, 222 (1937) cited with approval by us in *Ridgley v. Beatty,* 222 Md. 76, 82, 83, 159 A. 2d 651, 655 (1960). Inasmuch as the two papers would have been

admissible, prima facie, against the decedent if he had been alive and involved in litigation in which they were relevant, the identification of them by Nephew Erle does not controvert or frustrate the policy of the statute. See *Kerwin v. Bank of Douglas,* 93 Ariz. 269, 379 P. 2d 978 (1963) ; *Wunschel v. McKinney,* 251 Iowa 881, 103 N.W.2d 81 (1960) ; *Stephenson v. Stephenson,* 351 Mo. 8, 171 S.W.2d 565 (1943), cases from States which have statutes with provisions essentially similar to Article 35, § 3.

This does not mean of course that evidence might not possibly be offered to challenge or impair the prima facie effect of the papers as admissions, although this would appear difficult in this case in view of the uncontradicted testimony of Virginia Stacy, wife of Nephew Erle, in regard to the preparation and execution of the two papers. In regard to the letter of April 5, 1967, she testified that her husband visited Uncle Erle, came back to the company office, typed the letter, left the office with the completed letter without any signature on it and later returned with the letter with Uncle Erle's signature on it. She recognized the signature as being that of Uncle Erle. The letter was then offered again, but the executor's objection was again sustained by the Chancellor. Mrs. Stacy testified to substantially the same effect in regard to the document of December 6, 1967, again identifying Uncle Erle's signature, but again the Chancellor sustained the objection of the executor. Mrs. Stacy was not a party to the suit and hence Art. 35, § 3 did not apply to her testimony. In our opinion, the testimony of Mrs. Stacy, plus her identification of Uncle Erle's signature as genuine (this testimony being supported by the Stipulation of Facts), made these documents admissible, apart from Nephew Erle's testimony.

We might add also that the fact that counsel for the executor cross-examined Nephew Erle in regard to those documents would, under our previous decisions already mentioned, render them admissible even if otherwise inadmissible. In regard to the letter of April 5, 1967, after

it was marked for identification as Defendant's Exhibit No. 1, counsel for the executor asked Nephew Erle the following questions and received the following answers:

"Q. Mr. Stacy, referring to Defendant's Exhibit No. 1, where did you get that? A. I am confused. Are we talking about this one?

"Q. This one right here. (indicating) A. Where did I get it?

"Q. Yes. A. I prepared it from instructions from my Uncle Erle is where I got it."

In regard to the document of December 6, 1967, after it had been marked as Defendant's Exhibit No. 2 for identification, counsel for the executor asked Nephew Erle the following questions and received the following answers:

"Q. Where did you get this paper, Mr. Stacy? A. I prepared it on instructions from my Uncle Erle.

"Q. Did he give it to you? A. He signed it after I prepared it, after he told me what to write."

For all of these reasons, we conclude that the two papers mentioned were admissible into evidence and it was prejudicial error to refuse to admit them. The executor, upon the remand, will have the opportunity to present any evidence he may have to try to lessen the probative value of the documents.

In our opinion, there was a confidential relationship between Uncle Erle and Nephew Erle so that the burden was upon Nephew Erle to show that there was no abuse by him of this confidential relationship and that the gifts were authorized by Uncle Erle and were his free and voluntary act and were "reasonable, fair and just." *Hagan v. Dundore*, 187 Md. 430, 50 A. 2d 570 (1947) ; *Myers v. Myers*, 185 Md. 210, 44 A. 2d 455 (1945) ; *Williams v. Robinson*, 183 Md. 117, 36 A. 2d 547 (1944) ; and *Zimmerman v. Freshour*, 108 Md. 115, 69 A. 796 (1908). The

testimony of Essie Mae Stacy, with the other testimony in the case, indicates to us that, prima facie, Nephew Erle met the burden of proof placed upon him because of the confidential relationship. We agree with the Chancellor's findings in the first opinion of December 22, 1969, that Essie Mae's uncontradicted testimony was "clear and convincing as to the voluntariness of the decedent's intention and the ultimate consummation of the gift some months later," rather than the later observation of the Chancellor in the later opinion of February 17, 1970. If the letter of April 5, 1967, and the document of December 6, 1967, are not substantially impaired upon the remand, they strongly corroborate Essie Mae's testimony so that it appears to us that the bill of complaint of the plaintiff executor should ultimately be dismissed.

We also note that there is no challenge to Uncle Erle's mental capacity; that Nephew Erle was an object of Uncle Erle's bounty; that Uncle Erle was not isolated from his relations, friends or his counsel; and that the gifts in question did not strip Uncle Erle of his property, but on the contrary, apparently amounted to less than half of his remaining estate.

> *Order and decree of February 17, 1970, reversed and the case remanded to the lower court for further proceedings in accordance with this opinion, the costs to be paid by the appellee from the estate of the decedent, Erle Edwards Stacy.*