SCHIFANELLI, Personal Representative of the
Estate of Marie E. Wallace et al.
*v.* WALLACE

[No. 159, September Term, 1973.]

*Decided February 28, 1974.*

178

The cause was argued before MURPHY, C. J., and BARNES,█ SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

Submitted on brief by *Thomas M. Schifanelli* for appellants.

*Warren B. Duckett, Jr.,* with whom were *Turk, Manis & Duckett* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

This appeal arises out of a dispute over the proceeds of a life insurance policy issued upon the life of Marie E. Wallace (Marie), now deceased, in which appellee, Frank W. Wallace (Frank), her surviving husband, was the named beneficiary. Following Marie's death from a gunshot wound inflicted by Frank, a declaratory judgment suit was filed in equity by appellant, Thomas M. Schifanelli, personal representative of Marie's estate, and on behalf of her two minor children by prior marriages. In this suit, appellants sought a declaration requiring that the policy proceeds be paid to the estate, and not to Frank. The chancellor (Sachse, J.) disagreed, and passed a declaratory decree in which he held that they were to be paid to the named beneficiary. We affirm.

Rather extensive testimony was presented by an array of witnesses, consisting mainly of relatives, friends and acquaintances of the Wallaces, coupled with officers from the state police. Interestingly enough, despite the bevy of witnesses and the wide range of their testimony, there are remarkably few discrepancies.

On October 26, 1970, Marie and Frank were married and thereafter lived in Gambrills; she was then 36, and he was some ten years younger. This was apparently her third marriage, her second marriage to Robert L. Faulkner (Faulkner) having been entered into on June 2, 1963. That marriage was terminated on April 3, 1970, by a divorce on the ground of adultery in which John B. Bealefeld (Bealefeld) was named as Marie's paramour. She and Bealefeld had been seeing each other since June 1969, and continued to do so with some regularity until she started dating Frank in December 1969. She saw him with less frequency from that point, especially after she and Frank began living together in March 1970. Although there was no evidence that Bealefeld saw or dated Marie after her marriage to Frank in October 1970, he did meet her for a drink on two or three occasions during the period of her courtship with Frank — between December 1969 and the marriage.

A number of the witnesses, including some produced by appellants, testified that they had never seen Frank exhibit a violent temper, even after he had been drinking. The sole reference to any intemperate behavior on his part came from Bealefeld who stated: "One time [prior to the marriage], he said he'd shoot *me* if he ever caught me messing around with Marie Faulkner, at the time." (emphasis added). Frank was otherwise described variously as a "gentleman" and "a very nice quiet natured person."

Those witnesses who were acquainted with the relationship between Frank and Marie were united and uncontradicted in describing it as a happy one. They testified that although Marie had been romantically involved with Bealefeld during the latter stages of her marriage to Faulkner and for a brief period immediately

following the divorce, once she began a serious romance with Frank, there was no question of her loyalty to him. The witnesses described the Wallaces' relationship in the most glowing terms: "Marie did love Frank"; "I thought they were very happy"; "they acted like the ideal couple"; "they were quite close and loving"; "they seemed like two people in love"; and "they were a very happy couple."

On the morning of March 4, 1971, the date of Marie's death, Frank finished working his shift at a nearby plant at 8:30 a.m. From there he went to the home of a friend and co-worker, Ronald J. Monroe (Monroe), to see another friend off to South Carolina. After that friend departed, Frank and Monroe went to a neighborhood bar where over the span of some two hours or more, Frank consumed three or four bottles of beer and ate a cheeseburger and some chili. His conduct seemed quite normal and sober during the entire period, and was the same when they departed about 12:30 p.m. Before leaving, Monroe purchased a "six-pack" from which he gave Frank one can to take home.

It had snowed that morning — to a depth of approximately one inch — but Monroe described Frank who was driving as "very capable of handling himself." He drove to Monroe's home — a distance of some two miles — dropped him off, and headed for his own home. By this time, snow flurries had resumed, but during the remainder of the trip, he experienced no difficulty driving because of the beer or the weather conditions.

When Frank arrived home, he found Marie ironing clothes. He stated he was in a good frame of mind — that being Thursday morning — because he was not scheduled to work until Monday morning. Shortly after he opened the can of beer which had been given to him by Monroe — and while he was talking to Marie — he received a phone call from an officer of a local bank, who advised him that their joint application for a loan to purchase a new home had been approved. Especially happy at hearing this news, Frank and Marie resumed their conversation.

Ultimately, Marie, who was to report for work at 4:00 p.m., went to the bedroom to dress. While she remained

seated on the bed, Frank rose and pulled from a holster hanging on the dresser his handgun for the purpose of describing its operation to Marie. It was a fully loaded .44 caliber magnum revolver, described by one expert witness as "the most powerful of all hand guns." He returned with it to the bed and began showing it to her. He testified that by describing its operation, he meant that he was showing Marie "[h]ow to cock the gun . . . how to return it to the safety, things of that nature."

Testimony by a firearms expert from the state police established that Frank's gun, being a single-action revolver, is not fired by merely pulling the trigger. It is also necessary to bring the hammer back manually; then the trigger must be pulled to release the hammer. To place the hammer in a safety position, it is necessary to remove the finger from the trigger after it is released from the "sear," but before the hammer falls into the safety notch; if the hammer is allowed to fall before the finger is removed from the trigger, the gun discharges. The same expert stated that Frank's gun was in normal operating condition and therefore would also fire under those conditions; in fact, that is precisely what occurred while he was exhibiting the gun to Marie. "[His] thumb slipped off the hammer [before he removed his finger from the trigger] and the gun went off." As a consequence, the shell entered Marie's abdomen and she screamed. Frank then "threw the gun down," telephoned for an ambulance, and also called Marie's sister.

A thorough investigation conducted by the state police immediately after the incident was reported to them, revealed no evidence of a physical struggle. The police investigation also included the performance of a "breathalyzer" test on Frank. Strangely enough, although records pertaining to that test were produced — including the result of .15 — no effort was made to interpret or explain this evidence. Frank denied intentionally shooting his wife, and also denied that he was angry at her or jealous of anyone else. In addition to testifying that he loved Marie very much, he also was permitted to draw a diagram of the bedroom. Virtually his entire testimony regarding the

events of that day — including his feelings toward Marie — was admitted over appellants' vigorous objections.

Following Marie's death, Frank was promptly indicted for manslaughter.[1] The criminal case came on for trial before Judge James L. Wray, sitting without a jury, in the Circuit Court for Anne Arundel County. He found Frank guilty of manslaughter, but following a pre-sentence investigation, struck the verdict of guilty and placed Frank on probation without verdict.[2]

At the conclusion of the trial of this case, the chancellor held the matter sub curia, and then filed a thoroughly considered opinion followed by a decree in which he declared that Frank ". . . is entitled to the proceeds of the policy insuring the life of Marie . . . ." After a detailed review of the evidence, Judge Sachse found that the shooting was unintentional. Nevertheless, because of the alcoholic consumption factor and Frank's handling of the lethal and fully loaded gun under the circumstances described in the evidence, he also found him guilty of gross negligence. Since the killing was not intentional, however, the chancellor held that Frank, as the named beneficiary, was not precluded from collecting the policy proceeds.

Two questions are presented for our consideration by this appeal:

(1) Whether, in light of Code (1957, 1971 Repl. Vol.) Art. 35, § 3, the "Dead Man's Statute," the testimony by the surviving husband of what transpired before the shooting, including his statements of how he felt toward his wife, how the gun was fired, his denials that he intentionally shot her, and the diagram of the bedroom, was properly admissible.

(2) Whether the chancellor erred in ruling that because

---

**1.** According to the docket entries — the only documentation of the criminal case to be found in the record of this case — he was indicted "for feloniously killing Marie Ellen Wallace on or about the 4th day of March 1971."

**2.** The effect of this action, under Maryland Code (1957, 1971 Repl. Vol.) Art. 27, § 641, was to completely eradicate the verdict of guilty. Bartlett v. State, 15 Md. App. 234, 289 A. 2d 843 (1972), aff'd mem., 267 Md. 530, 298 A. 2d 16 (1973).

the killing was unintentional, the named beneficiary was entitled to recover the policy proceeds even though her death was the product of gross negligence.

## (1)

The question of the admissibility of Frank's testimony is governed by the "Dead Man's Statute," Section 3 of Art. 35, which provides in relevant part:

> "In actions or proceedings by or against executors, administrators, heirs, devisees, legatees or distributees of a decedent as such, in which judgments or decrees may be rendered for or against them, and in proceedings by or against persons incompetent to testify by reason of mental disability, no party to the cause shall be allowed to testify as to any *transaction had with,* or statement made by the testator, intestate ancestor or party so incompetent to testify, either personally or through an agent since dead, lunatic or insane, unless called to testify by the opposite party, or unless the testimony of such testator, intestate, ancestor or party incompetent to testify shall have already given in evidence, concerning the same transaction or statement, in the same cause, on his or her own behalf or on behalf of his or her representative in interest; . . . ." (emphasis added).

The first category of which appellants complain consists of Frank's subjective feelings: that he was not jealous of anyone, that he loved Marie very much, and that he did not intentionally shoot her. Although we have found no case remotely presenting such an issue, nor have the parties brought any to our attention, we have little hesitation in expressing our agreement with the chancellor that Frank's testimony concerning these emotions is not evidence of a "transaction" within the meaning of the statute.

In *Estate of Soothcage v. King,* 227 Md. 142, 176 A. 2d 221 (1961), quoting from the earlier case of *Griffth v. Benzinger,* 144 Md. 575, 596, 125 A. 512 (1924), Chief Judge Brune said for the Court:

" ' . . . The statute was intended to prevent one party to a transaction from testifying to the acts and declarations of a decedent whose acts are under consideration in a proceeding to which the witness is a party, *to enforce obligations* arising from such transactions.' " 227 Md. at 150 (emphasis in *Estate of Soothcage v. King*).

We have held that the statute is to be narrowly construed, *Snyder v. Crabbs*, 263 Md. 28, 30, 282 A. 2d 6 (1971); *Stacy v. Burke*, 259 Md. 390, 404, 269 A. 2d 837 (1970); *Guernsey v. Loyola Federal Ass'n*, 226 Md. 77, 80, 172 A. 2d 506 (1961); *Shaneybrook v. Blizzard*, 209 Md. 304, 309, 121 A. 2d 218 (1956). Furthermore, the statute is to be read in the light of § 1 of Art. 35, which removed the disqualification of witnesses who have an interest in the litigation, subject to certain exceptions including those in § 3, *Snyder v. Crabbs; Estate of Soothcage v. King; Shaneybrook v. Blizzard,* all *supra.*

In *Ridgley, Exec. v. Beatty,* 222 Md. 76, 83, 159 A. 2d 651 (1960), citing *Hollister v. Fiedler,* 17 N. J. 239, 111 A. 2d 57, 62 (1955), Judge Horney, for the Court, enunciated the test for determining what is a "transaction" within the meaning of the statute as: " 'Whether, in case the witness testify falsely, the deceased, if living, could contradict it *of his own knowledge.*' " (emphasis added).

Viewed in light of these authorities, the testimony of Frank that he was not jealous of anyone else, that he loved his wife, and that he did not shoot her intentionally simply does not mount up to evidence of a "transaction had with" her. In short, his testimony in this regard did not relate acts and declarations of the decedent that would establish a transaction creating obligations between them. Nor does this testimony meet the above-quoted test for determining whether it refers to a "transaction," since the decedent, even "if living, could [not] contradict" her husband's testimony describing his emotional feelings "of [her] own knowledge." We hold that this testimony was not barred by the Dead Man's Statute and was therefore properly admitted.

The other evidence attacked by appellants under this

statute included a diagram of the bedroom drawn by Frank and his testimony of the circumstances surrounding the fatal event. It should be noted that the chancellor was very careful to exclude any testimony of what was said by Marie. It is also of some relevance to note that the room and its contents were not only described by the investigating police in their testimony, but were depicted by photographs taken by them immediately upon arriving at the scene. Those were offered as exhibits by appellants and were admitted into evidence. Thus, any testimony by Frank that described the room and its contents was merely cumulative.

Support for the contention that this testimony was admissible is found in *Shaneybrook v. Blizzard, supra,* which involved a collision between two cars. One of the operators had died before the trial, and the occupants of the other car were permitted to testify concerning the facts and circumstances of the accident, including the movements and positions of both cars. The Court there thoroughly reviewed the decisions of other courts, noting a division of authority regarding the application of "Dead Man's Statutes" in tort cases. Among the cases cited were *Seligman v. Orth,* 205 Wis. 199, 236 N. W. 115 (1931), *Krantz v. Krantz,* 211 Wis. 249, 248 N. W. 155 (1933), and *M'Carthy v. Woolston,* 210 App. Div. 152, 205 N. Y. S. 507 (1924). Speaking for this Court, Judge Henderson then said:

> "We think the Wisconsin and New York cases express the better view. Our statute is clearly a remedial one, and the exception to it should be narrowly construed. It may well be that the word 'transaction,' standing alone, would not be limited to contractual relationships, and the reference to 'statements' might properly bar any testimony as to admissions made by or conversations with a decedent following an automobile accident. It is difficult to see how the testimony of the plaintiffs in the instant case as to the movements of their car before the other car came in sight could be ruled out on any theory. But we think the exception should not be construed to include a narration of

the observed course and speed of the other automobile, or testimony as to the place where the collision occurred. The Maryland statute couples the words 'transaction had with' and the words 'or statements made by,' and both are followed by the words 'personally or through an agent since dead * * *.' The relationship between the respective drivers was fortuitous and involuntary, and the word 'transaction' imports a mutuality or concert of action. . . ." 209 Md. at 311-12.

For their position that the admitted testimony constituted a "transaction," appellants rely almost exclusively on *Maciejczak v. Bartell,* 60 P. 2d 31 (Wash. 1936), where the court excluded testimony of the events surrounding a fatal assault. The question posited there was whether the Dead Man's Statute applied to actions "arising ex delicto or only to actions arising ex contractu." The court held: ". . . The authorities are in conflict, but we are of the opinion that in the greater number of jurisdictions the word 'transaction' has been held to include torts." 60 P. 2d at 35.

As we noted in *Shaneybrook, supra,* although virtually all the Maryland cases dealing with the statute have involved contracts, rather than torts, we never have flatly drawn a distinction on that basis in deciding the application of the statute. Nor do we find it necessary to deal in such broad terms here. Suffice it to say, that *Maciejczak v. Bartell, supra,* in light of our holding in *Shaneybrook,* does not support the argument of appellants; and we decline to follow it.

Cases cited in *Shaneybrook* indicate that Maryland is not alone in admitting testimony of events surrounding automobile accidents. Other courts have subsequently followed this lead. *Day v. Stickle,* 113 So. 2d 559, 80 A.L.R.2d 1291 (Dist. Ct. App. Fla. 1959), *cert. denied,* 115 So. 2d 414 (Fla. 1959) (observation by survivor of position and course of automobile driven by decedent); *Simmons v. Larry,* 109 Ga. App. 424, 136 S.E.2d 502 (1964), *Knoepfle v. Suko,* 108 N.W.2d 456 (N. D. 1961) *aff'd on other grounds,* 114 N.W.2d 54 (N. D. 1962) (independent observations of speed and position of automobiles).

Similar observations also have been allowed in a dental malpractice case, *Germann v. Matriss*, 55 N. J. 193, 260 A. 2d 825 (1970). There the court aptly stated:

". . . In a system of justice which has established as a general rule that all persons should be qualified to testify, and that disqualification should be the exception, there is no sound reason why the survivor in a negligence death case should be barred by the statute from testifying as to what he saw and did and what he saw the decedent do or fail to do, which independent actions or conduct coalesced without any mutuality of purpose to produce the accident or injury. . . ." 260 A. 2d at 838.

The New Jersey case echoes the principle suggested in *Shaneybrook, supra*, that mutuality or concert of action is necessary to constitute a "transaction." Since *Shaneybrook*, the same proposition has been followed in these automobile cases: *Knoepfle v. Suko, supra*, at 462, *Hicks v. Battey*, 259 S. C. 426, 192 S.E.2d 477, 479 (1972), and *Harper v. Johnson*, 162 Tex. 117, 345 S.W.2d 277, 280 (1961). See the cases collected at Annot. 80 A.L.R.2d 1296 (1961).

Applying the *Shaneybrook* test, we conclude that the uncontradicted evidence presented here also establishes the events transpiring between Frank and Marie immediately prior to her death as "fortuitous and involuntary" and lacking in "a mutuality or concert of action." Thus, what occurred was not a "transaction," as that term is used in the statute, and the testimony by Frank was properly admitted.

(2)

We pass then to the other question posed by appellants: Whether the named beneficiary under a life insurance policy is precluded from collecting the proceeds by reason of the fact that he unintentionally killed his wife — upon whose life it had been issued — but as the result of gross negligence. Virtually the same question was urged upon us, but was not reached in *Chase v. Jenifer*, 219 Md. 564, 150 A.

2d 251 (1959), since there the killing was held to be intentional.

There, we held that "[w]here the killing is both felonious and intentional, . . . the beneficiary cannot prevail. . . ." 219 Md. at 570. In that case, a criminal court judge had found the beneficiary guilty of manslaughter without designating, of course, whether it was voluntary or involuntary, but the chancellor specifically found that the killing was intentional. We noted that even if the judge in the criminal case had acquitted her, "the holding would probably have not been conclusive on the chancellor." 219 Md. at 569.

Although this question remains undecided in Maryland, the overwhelming weight of authority allows recovery where the beneficiary causes the death of the insured unintentionally or not feloniously. *Tippens v. Metropolitan Life Ins. Co.*, 99 F. 2d 671 (5th Cir. 1938); *Throop v. Western Indemnity Co.*, 49 Cal. App. 322, 193 P. 263 (1920); *Schreiner v. High Court of Illinois Catholic Order of Foresters*, 35 Ill. App. 576 (1890); *Stacker v. Mack*, 126 Ind. App. 95, 130 N.E.2d 484 (1955); *Beene v. Gibraltar Industrial Life Ins. Co.*, 116 Ind. App. 290, 63 N.E.2d 299 (1945); *Commercial Travelers Mutual Acc. Ass'n v. Witte*, 406 S.W.2d 145, 27 A.L.R.3d 784 (Ky. 1966); *Jackson v. Prudential Insurance Co. of America*, 106 N. J. Super. 61, 254 A. 2d 141 (1969); see the cases collected in Annot. 27 A.L.R.3d 794 § 6 (1969).

The rule which prevents a beneficiary who has intentionally killed the insured from recovering on an insurance policy is grounded on the public policy against permitting a wilful and felonious killer to profit by his felony. Thus, it has no application where even though the acts of the beneficiary cause death, they are without the intent to do so, *Tippens v. Metropolitan Life Ins. Co., supra;* where the death is the result of accident, or even when caused by such gross negligence on the part of the beneficiary that he is guilty of involuntary manslaughter, the beneficiary may still recover, *Commercial Travelers Mutual Acc. Ass'n v. Witte, supra;* the basic rule is that while a beneficiary cannot recover where the death of the

insured has been intentionally caused by his act, if it is the result of carelessness and is not intentional, the beneficiary's rights under the policy are not barred, *Commercial Travelers Mutual Acc. Ass'n v. Witte,* and *Jackson v. Prudential Insurance Co. of America,* both *supra.*

In challenging this overwhelming weight of authority, and in thus contending for a rule that would disqualify the beneficiary from recovering the policy proceeds even though the killing was unintentional, but the result of gross negligence, appellants rely exclusively upon two English cases, *Hall v. Knight and Baxter,* Law. Rep. Prob. Div. 1 (1914) and *Cleaver v. Mutual Reserve Fund Life Association,* 1 Q.B. 147 (1892). But, as we noted in *Chase v. Jenifer, supra,* where those two cases are cited, the courts in this country do not follow what appears to be the rule of the English cases.

We hold, therefore, that appellee was not barred from recovering the policy proceeds merely because the death of his wife was the result of gross negligence where that determination was accompanied by an express finding that the death was caused unintentionally.

> *Decree affirmed; appellants to pay costs.*