**Harry V. CHEATLE, Appellant,**

v.

**Lorene CHEATLE, Appellee.**

**No. 94–PR–281.**

District of Columbia Court of Appeals.

Argued March 30, 1995.
Decided July 24, 1995.

Edgar B. May, with whom MacKenzie Canter III and Mark J. Diskin, Washington, DC, were on the brief, for appellant.

Michael A. Dymersky, with whom E. Tillman Stirling, Washington, DC, was on the brief, for appellee.

Before TERRY, FARRELL, and KING, Associate Judges.

KING, Associate Judge:

This appeal arises out of a will contest in which appellant, Harry Cheatle ("Harry"), the brother of the deceased, Colonel Francis Edgar Cheatle ("Colonel"), challenged the right of their sister, appellee Lorene Cheatle ("Lorene"), to take as sole beneficiary under the Colonel's will, alleging her abuse and neglect of the Colonel hastened his death, and thus required her to forfeit her inheritance. The principal question on appeal is whether, where there has been no conviction for the criminal offense of involuntary manslaughter, a finding that the death of the testator was the result of gross neglect by the beneficiary is sufficient to mandate forfeiture of the beneficiary's right to take under the terms of a will. For the reasons set forth below, we hold that such a finding of gross neglect is insufficient as a matter of law to deprive a beneficiary of her right to receive her inheritance; accordingly, we affirm the trial court's judgment in favor of Lorene Cheatle.

I.

In July of 1984, at 71 years of age, Lorene came to live with her brother, 83 year-old Colonel Cheatle, after the death of his wife. According to the terms of the Colonel's will, executed in 1964, Lorene was his sole heir, designated to inherit his entire estate valued at over one million dollars, providing she survived him and his wife predeceased him. Harry contends that "Lorene voluntarily assumed the duty to care for the Colonel after she arrived in Washington." Lorene, however, maintains the Colonel requested that she come live with him. While the nature and quality of Lorene's care is contested, it is undisputed that Lorene was the primary caretaker of the Colonel from 1984 until his death on April 24, 1992. The continuity of Lorene's care was interrupted by the separate hospitalizations of both Lorene and the Colonel, and temporary periods of care administered by independent home care professionals.

Following the Colonel's death on April 28, 1992, Lorene filed a petition to probate the Colonel's will. On April 30, 1992, the Colonel's brother, Harry, filed the instant will contest, alleging: (1) the 1964 will was revoked by operation of law because Lorene abused and neglected the Colonel and misappropriated his property (Count I); (2) Lorene forfeited her status as beneficiary by intentionally undermining the decedent's health to hasten his death (Count II); (3) Lorene unduly influenced and prevented the Colonel from revoking his 1964 will (Count III); (4) Lorene unduly influenced or coerced the Colonel to transfer assets into the joint names of the Colonel and Lorene (Count V); and (5) the Colonel executed a will subsequent to the 1964 will which was suppressed by Lorene (Count VI). Harry also sought appointment of a special administrator *pendente lite*, pursuant to D.C.Code § 20–531 (Count IV).

At a bench trial, which began on January 3, 1994, Harry maintained that Lorene, aware that she alone stood to benefit under the Colonel's will, "engaged in a pattern of conduct that undermined [the Colonel's] health and shortened his life." Specifically, Harry asserted that Lorene failed to provide the Colonel with sufficient food and water and failed to keep him clean; isolated him from friends and relatives; assumed control of his finances without his consent; interfered with the care provided to the Colonel by independent home care professionals; and sexually abused the Colonel. At the close of Harry's case-in-chief, the Court dismissed Counts III (fraud, coercion and undue influence) and VI (suppression of a later will).[1]

Lorene claimed that she loved her brother and did her best to take care of him and meet his needs. She testified that she assisted the Colonel with his financial affairs at his request, maintained his household with the help of friends, and fired the home care personnel because they were "takeroverish"

1. Harry does not challenge the dismissal of those counts in this appeal.

and "officious," and they improperly performed their duties. In sum, Lorene insisted that she did all she could to take care of her brother and see to his wishes.

The Colonel died in the hospital on April 24, 1992, of congestive heart failure and aspiration pneumonia at the age of ninety-one. Harry contends that Lorene's abuse shortened the Colonel's life by "predispos[ing] him" to congestive heart failure. Harry's expert in geriatrics and elder abuse, Dr. Cefalu, testified that Lorene's conduct "predisposed [the Colonel] to a precarious and premature death." However, one of the Colonel's treating physicians testified at his videotaped deposition which was admitted at trial: "it was my opinion and the opinion of the team that [the Colonel's] diabetes mellitus contributed to his dehydration ... and malnutrition, and contributed almost certainly to his congestive heart failure."

The trial court found that "Lorene Cheatle did to Colonel Cheatle about all that the plaintiff said she did, except that I don't find that she acted with deliberate, specific malice toward the Colonel himself." The court found that Lorene was "selfish, angry, resentful, indignant, bitter, self-centered, spiteful, vindictive, paranoid and stingy," and that her "conduct did shorten the decedent's life." The court further found that the "net result" of Lorene's actions amounted to "benign neglect of Colonel Cheatle, indeed, perhaps very close to if not actual gross neglect." However, because the trial court could not find that Lorene's conduct was willful or designed to hasten the Colonel's death, "even such sad and terrible conduct [such as Lorene's] d[id] not authorize [the court] to grant the relief requested." Accordingly, the court entered judgment in favor of Lorene on Counts I (revocation by operation of law) and II (forfeiture of rights as beneficiary because of wrongdoing), ruled that Counts IV (request for special administrator) and V (undue influence) were moot, and admitted the Colonel's will to probate.[2] This appeal followed.

## II.

In this appeal, Harry challenges the court's refusal to grant the relief requested in Counts I and II. In Count I, Harry alleged that the Colonel's 1964 will was revoked by operation of law because, after assuming the duty to care for the Colonel, Lorene abused and neglected him, and wrongfully appropriated his property. In Count II, Harry alleged that because Lorene engaged in a pattern of conduct to shorten the Colonel's life, she forfeited her status as his beneficiary. In appealing the judgment against him on Counts I and II, Harry claims that the trial court erred in ruling that Lorene did not forfeit her right to take under the Colonel's will, alleging that the court should have applied the District of Columbia "slayer" statute, which provides:

> A person *convicted of felonious homicide* of another person, by way of *murder or manslaughter*, takes no estate or interest in property of any kind from that other person by way of:
>
> (1) inheritance, distribution, devise, or bequest.... The estate, interest, or property to which the person so convicted would have succeeded or would have taken in any way from or after the death of the decedent goes, instead, as if the person so convicted had died before the decedent.

D.C.Code § 19–320 (1989 Repl.) (emphasis added). Harry further contends that, under the common law, an actual criminal conviction for murder or manslaughter was not necessary to invoke the slayer statute, and because the trial judge's finding that Lorene grossly neglected the Colonel amounts to a finding of involuntary manslaughter, that finding was sufficient to require Lorene to forfeit her inheritance.

Lorene first responds that, contrary to Harry's assertion, the court did not find Lorene responsible for gross neglect, but rather found that her "attitude and actions had the net result ... of benign neglect of Col. Chea-

---

**2.** By order dated May 22, 1992, the trial court appointed James J. Bierbower Special Administrator of Colonel Cheatle's estate. Therefore, following the trial, the court ruled that Count IV of Cheatle's complaint, the request for a special administrator, was moot. The trial court also ruled that Count V (undue influence) was moot. Neither of these rulings has been challenged in this appeal.

tle." Consequently, Lorene maintains that the court's findings did not satisfy the elements of involuntary manslaughter. Alternatively, Lorene argues that, even if the trial court found Lorene grossly negligent in her care of the Colonel, and that her actions establish the elements of involuntary manslaughter, a criminal *conviction* of manslaughter is required to mandate forfeiture of her rights. In short, she maintains that, absent a criminal manslaughter conviction, it must be shown that Lorene intentionally caused the Colonel's death in order to require forfeiture under the common law. Finally, Lorene claims that the trial court properly found that Lorene's conduct toward the Colonel was not intentional, and thus, Lorene cannot be required to forfeit her right to take under the terms of the Colonel's will.

## A. Applicable Law

Before we turn to our analysis of the issue presented, we will briefly discuss the underlying legal principles. There are two potential sources of law which impact our decision in this case: D.C.Code § 19–320 ("slayer" statute), and the common law of the District, derived from Maryland, if it has not been supplanted by the slayer statute. *See Napoleon v. Heard*, 455 A.2d 901, 903 (D.C.1983) ("Maryland, the source of the District's common law [is] an especially persuasive authority when the District's common law is silent."). We do not reach the issue of whether the common law rules survive the enactment of D.C.Code § 19–320 because we conclude that Lorene's right as a beneficiary is not forfeited under either the slayer statute or the common law.

■ Under the common law, one who feloniously and intentionally kills another is barred from receiving the proceeds of a life insurance policy on the victim. *Schifanelli v. Wallace*, 271 Md. 177, 315 A.2d 513, 519 (1974). This rule, "whether it be construed as one of public policy or of common law," which prevents one who intentionally kills another from taking as a beneficiary, is based upon the maxim that "no one should be allowed to benefit from his own wrong." *Napoleon*, 455 A.2d at 903; *accord, Schifanelli*, 315 A.2d at 519 ("the rule ... is grounded on the public policy against permitting a wilful and felonious killer to profit by his felony"); *see also Barnes v. Metropolitan Life Ins. Co.*, 97 Daily Wash.L.Rptr. 969, 973 (D.C.Super.Ct. June 9, 1969) ("it is a well settled rule that a beneficiary of a life insurance policy who murdered or feloniously caused the death of the insured forfeits all rights to the proceeds of the policy"). Invocation of the common law rule requires proof of the beneficiary's intent to kill the victim: "[the rule] has no application where even though the acts of the beneficiary cause death, they are without the intent to do so." *Schifanelli*, 315 A.2d at 519 (citation omitted). Unintentional conduct, "even ... such gross negligence on the part of the beneficiary that he is guilty of involuntary manslaughter," does not bar the beneficiary from taking under the terms of the life insurance policy. *Id.* The common law does not require a conviction to bar recovery, and thus proof beyond a reasonable doubt is not required. What is required, however, is proof in a civil proceeding by a preponderance of the evidence of an intent to cause death.

■ Further, a conviction for involuntary manslaughter triggers application of the District of Columbia slayer statute. *See Turner v. Travelers Ins. Co.*, 487 A.2d 614, 615 (D.C. 1985) ("plain wording of § 19–320(a) ... bars persons convicted of involuntary manslaughter ... from taking certain property ... made available by the death"). Under the District's slayer statute, D.C.Code § 19–320, *supra* at 1364, a person *convicted* of a felonious homicide of another person, either murder or manslaughter, is prohibited from taking an "estate or interest in property of any kind" from that person. The statute does not differentiate between voluntary and involuntary manslaughter; thus, any manslaughter conviction bars recovery to a beneficiary convicted of that offense.

Although D.C.Code § 22–2405 (1989) sets out the penalties for manslaughter, "there is no statutory definition of manslaughter in the District of Columbia." *United States v. Bradford*, 344 A.2d 208, 213 (D.C.1975). In *Comber v. United States*, 584 A.2d 26 (D.C. 1990) (en banc), this court distinguished voluntary from involuntary manslaughter, ob-

serving that while "[b]oth ... may still be accurately defined as homicide without malice aforethought on the one hand and without justification or excuse on the other ... [t]he two offenses are distinguishable by virtue of the perpetrator's state of mind...." *Id.* at 37 (internal citation omitted). Specifically, in all voluntary manslaughters, "the perpetrator acts with a state of mind which, but for the presence of legally recognized mitigating circumstances, would constitute malice aforethought." *Id.* In contrast, involuntary manslaughters "are killings in which the perpetrator's state of mind, without any consideration of any issues of mitigation, would not constitute malice aforethought." *Id.* This mental state of "malice aforethought" is basically a term of art to denote the element of the intent to kill or cause serious bodily injury which is required for a conviction of murder. *Id.* at 38. One can also be convicted of murder without actual malice if an act involves "such a wanton and willful disregard of an unreasonable human risk as to constitute malice aforethought even if there is not actual intent to kill or injure." *Id.* at 39.

 To summarize, a conviction for murder or manslaughter is a complete statutory bar to inheriting from the victim under the D.C. slayer statute. Additionally, in the absence of a conviction, under the common law, a finding by a preponderance of the evidence in a civil proceeding that one intentionally took the life of another requires the killer to forfeit his or her rights as a beneficiary of the victim. This leads us to the question which controls the outcome of this case: does a finding, by a preponderance of the evidence, that death was caused by the gross negligence of the beneficiary, where there has been neither a criminal conviction nor a finding that the killer acted intentionally, require a beneficiary to forfeit his or her right to take under the terms of a will?

### B. Court's Findings

 We begin our analysis by turning to the trial court's finding:

> [Lorene's] attitude and actions had the net result ... of benign neglect of Colonel Cheatle, indeed, perhaps very close to if

not actual gross neglect. But I cannot find that it was willful, designed and intended by her to result in Colonel Cheatle's death or even his hastened death.... Based on these findings and my conclusions about the law ... judgment must be entered in favor of [Lorene] on the remaining counts One and Two.

The parties interpret the court's finding differently: Harry contends that the trial court found Lorene was grossly negligent, whereas Lorene contends that the court found that she was not. We do not need to resolve this dispute because, for the reasons discussed below, even if Lorene was grossly negligent, under the common law she would not be barred from benefiting from the will because the court also found that she did not intend to kill or injure the Colonel.

The trial court's findings on that score are "entitled to considerable weight," *Pennington v. United States,* 471 A.2d 250, 252 (D.C. 1983), and we will not disturb those findings unless they are without evidence to support them or are clearly erroneous. *Fleming v. Carroll Pub. Co.,* 621 A.2d 829, 833 (D.C. 1993). "If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it"; therefore, we will not disturb the trial judge's finding that, although Lorene may have been grossly negligent in her care of her brother, she did not intentionally cause his death. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

Harry claims, however, that the court erred in ruling that a finding of a specific intent to kill or inflict serious bodily harm on the Colonel was necessary to bar Lorene from taking under the will. First, Harry argues that "the Court's findings satisfy the elements of involuntary manslaughter ... [and a] finding of deliberate malice is not required for a conviction of involuntary manslaughter." While Harry is correct when he asserts that proof of intent to kill or harm is not necessary to establish guilt of involuntary manslaughter,[3] it is immaterial in this case

---

3. *See, e.g., Comber, supra,* 584 A.2d at 37 ("All

involuntary manslaughters ... are killings in

because Lorene was, in fact, not convicted of involuntary manslaughter.

Harry also contends that a conviction is not required to invoke the slayer's statute. As discussed, *supra*, those found to have intentionally killed another in a civil proceeding, even though there has been no criminal conviction, are prohibited from exercising their rights as the victim's beneficiary. *See, e.g., Schifanelli, supra,* 315 A.2d at 519. However, we have found no authority, and none has been presented by appellant,[4] which holds that one found to have caused death due to gross neglect in a civil proceeding, without any malice, is bound to forfeit her rights as a beneficiary of the deceased.

Although § 19–320 merely codified the common law[5] slayer's rule insofar as murder and voluntary manslaughter are concerned,[6] it extended the scope of the common law by including forfeiture for a conviction of involuntary manslaughter. Therefore, the common law rule against forfeiture for unintentional homicide, even if the prospective beneficiary's conduct was so grossly negligent to justify an involuntary manslaughter charge, has "been replaced by a statutory" basis that permits forfeiture, but only in the limited circumstances of a criminal conviction of involuntary manslaughter. *Swinson v. United States,* 483 A.2d 1160, 1162 (D.C.1984). Since § 19–320 "is in derogation of the common law" to that limited extent, the involuntary manslaughter portion of the statute should be "construed strictly." *Id.* Consequently, it follows that the inclusion of involuntary manslaughter in the statute was meant to require forfeiture in the instance of involuntary killing *convictions,* and not meant to broaden the common law regarding the requirement of intentionality in a civil context.

■ Accordingly, we hold that, where there has been no conviction of murder or manslaughter, a finding of gross negligence which caused death, where no intent to kill or harm has been shown, is insufficient as a matter of law to require forfeiture of the beneficiary's right to take from the deceased. We thus conclude that the trial judge correctly held that Lorene could not be required to forfeit her rights under the Colonel's will because her actions were not willful.

*Affirmed.*

---

which the perpetrator's state of mind ... would not constitute malice aforethought.").

4. The authorities relied upon by Harry which support forfeiture without a criminal conviction all required proof, in a civil proceeding by preponderance of the evidence, of the beneficiary's intent to kill or injure the benefactor. For example, in *Barnes, supra,* 97 Daily Wash.L.Rptr. at 969, the husband was acquitted in a criminal proceeding of murdering his wife. In a civil proceeding to determine if the husband could collect under the wife's insurance, the court decided the issue of homicide, *de novo,* under the corresponding burden of proof by a preponderance of the evidence. The court found that the husband had murdered his wife (*i.e.*: intentionally and feloniously killed) and thus could not reap the benefits of her insurance proceeds. Similarly, in *In re Estate of Eliasen,* 105 Idaho 234, 242, 668 P.2d 110, 118 (1983), a woman not convicted of any crime, was found to have hastened the death of her husband suffering from cancer by intentionally shooting him. The court specifically noted that, while a person may be acquitted of criminal charges, she may nonetheless forfeit her rights as beneficiary if "shown in a civil action to have been a *willful* slayer" (emphasis added).

5. As we have noted earlier, we do not decide whether the slayer statute supplanted the common law.

6. In *Napoleon* we held that D.C.Code § 19–320 "did not repeal" and merely codified the common law, and is therefore to be interpreted broadly. However, as we later acknowledged in *Turner, Napoleon* "was considering a second-degree murder case and focused only on the common law in that context." *Turner,* 487 A.2d at 615 n. 5. Therefore, we held that "the plain language of § 19–320(a) is in derogation of the common law line traditionally drawn between voluntary and involuntary manslaughter." *Id.*