693 A.2d 340

**Bernard J. STAAB et ux.**

v.

**AMERICAN MOTORISTS INSURANCE COMPANY.**

**No. 68 Sept.Term. 1996.**

Court of Appeals of Maryland.

· May 5, 1997.

Clarence ,M. Thomas (Nathaniel Fick, Fick & Petty, on brief, Towson; C. William Michaels, on brief), Baltimore, for Appellants.

Thomas L. Doran (Stephen J. Williams, DeCaro, Doran, Siciliano, Gallagher, Sonntag & DeBlasis, on brief), Lanham, for Appellee.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

WILNER, Judge.

The question before us is whether, by application of Maryland Code, § 541 of article 48A,[1] appellants, Bernard and Maria Staab, are entitled to uninsured motorist benefits in excess of the $300,000 limit provided in the automobile coverage part of their comprehensive liability insurance policy. In holding that they are, we shall distinguish the result that we reached in *Popham v. State Farm*, 333 Md. 136, 634 A.2d 28 (1993).

## *UNDERLYING FACTS*

On December 11, 1993, the Staabs, along with their minor son, were severely injured in an automobile accident. The accident occurred when another car, driven by Thomas Blackwell IV, swerved across the center line of Belair Road, in Baltimore County, and hit the Staab vehicle head-on. Blackwell was insured under a policy issued by the Maryland Automobile Insurance Fund; that policy, however, provided only the statutory minimum insurance coverage of $20,000 per person and $40,000 per occurrence.

Because the injuries suffered by them and their son far exceeded $40,000, the Staabs made a claim for uninsured motorist benefits under their policy, issued by appellee, American Motorists Insurance Company (AMI), a member of the Kemper Insurance Group. It is unquestioned that the AMI policy provided at least $300,000 of uninsured motorist coverage, and AMI essentially conceded that the Staabs were entitled to collect $260,000 ($300,000 less the $40,000 recovera-

---

**1.** Effective October 1, 1997, that section will be recodified as § 19–509 of the Insurance article.

ble through the MAIF policy) under that coverage. The dispute arose from the fact that, included as part of the AMI policy was a Personal Catastrophe Liability Endorsement providing excess liability coverage of $3,000,000. The Staabs contended that, by virtue of § 541 of article 48A, absent a valid written waiver by them, they were entitled, by reason of the excess liability coverage, to an equivalent amount of uninsured motorist coverage.

When AMI did not accede to their point of view, the Staabs filed suit in the Circuit Court for Baltimore County, seeking a declaratory judgment that the policy "provides coverage in the amount of $3,300,000 per accident for losses resulting from the actions of an uninsured motorist as defined by the policy." Relying on *Popham, supra,* 333 Md. 136, 634 A.2d 28, the court concluded otherwise and, granting AMI's motion for summary judgment, declared in a Memorandum Opinion and Order that the Staabs were entitled "only to the $300,000.00 of underinsured motorist coverage found in the primary automobile policy limit minus the $40,000.00 of the tortfeasor's liability coverage." This appeal ensued. We granted *certiorari* before any decision by the Court of Special Appeals.

## DISCUSSION

*Popham* involved a somewhat similar fact situation. Ms. Popham was seriously injured when the car in which she was a passenger was involved in an accident. The driver, whose negligence apparently caused the one-car accident, had only the statutory minimum liability insurance of $20,000 per person. The Popham family had its own insurance in the form of two policies issued by State Farm. One policy was a standard automobile policy providing liability coverage of $100,000 per person, $300,000 per accident, and uninsured motorist coverage of $300,000. The second policy was an "umbrella" or excess personal liability policy that afforded an additional $1,000,000 in liability coverage but no uninsured motorist protection.

Relying on § 541, as it read at the time of the accident, the Pophams sued State Farm to recover uninsured motorist benefits in an amount over the $300,000 limit stated in the standard automobile policy. The then-current statute required automobile policies issued in Maryland to contain uninsured motorist coverage "in at least the amount required under Title 17 of the Transportation Article." That minimum amount was, and still is, $20,000 per person, $40,000 per accident. Section 541(c)(2) also required insurers to offer, in writing, "the opportunity to contract for higher amounts than those provided under Title 17 of the Transportation Article if these amounts do not exceed the amounts of the motor vehicle liability coverage provided by the policy...."

Because State Farm, in issuing the "umbrella" policy, had not offered the Pophams the opportunity to purchase an additional amount of uninsured motorist coverage, up to the $1,000,000 in excess liability coverage afforded under the policy, the Pophams claimed that they were entitled under the statute to that amount of coverage, the premise being that, had such additional coverage been offered, they would have purchased it. State Farm's defense was based on another part of the statute—§ 541(f). In that section, the General Assembly stated, in relevant part, that "[p]olicies of insurance that have as their primary purpose to provide coverage in excess of other valid and collectible insurance ... *may* include uninsured motorist coverage as provided in subsection (c) of this section." (Emphasis added.) The insurer's position was that § 541(f), by using the word "may," made the offering of additional uninsured motorist coverage permissive and that the company's failure to offer such coverage therefore did not violate the statute.

The issue before us was simply one of statutory construction—the meaning of § 541(f) and its relationship with § 541(c)(2). It was clear that the "umbrella" policy at issue was a separate policy and that its primary purpose was to provide coverage in excess of other valid and collectible insurance. On that basis, we held that subsection (f) applied and that, under it, the offering of excess uninsured motorist cover-

age was permissive, not mandatory. Accordingly, we concluded that there was no statutory duty to offer the Pophams $1,000,000 of uninsured motorist coverage with the excess policy. *Id.* at 153, 634 A.2d at 36.

The statute that we construed in *Popham* has been amended. By 1992 Md.Laws, ch. 641, the Legislature repealed the provision in § 541(c)(2) requiring an insurer to offer in writing the opportunity to contract for higher amounts of uninsured motorist coverage, up to the amount of liability coverage provided by the policy, and, through the enactment of new subsections (g) and (h), mandated a new procedure for the provision of such additional coverage. Subsection (g)(1) declares that, unless waived by the first named insured, "the amount of uninsured motorist coverage under a policy of private passenger motor vehicle insurance shall be equal to *the amount of liability coverage provided under the policy.*" (Emphasis added.) Section 541(g)(4) complements that provision:

> "Failure of the first named insured to make an affirmative written waiver under this subsection requires an insurer to provide uninsured motorist coverage in an amount equal to the amount of the liability coverage, where the liability insurance coverage under a policy or binder of private passenger motor vehicle insurance is in excess of that required under § 17–103 of the Transportation Article."

In order to allow the insured to make an informed decision, other provisions in § 541(g) require the insurer, among other things, to advise the insured of the nature, extent, benefit, and cost of the coverage being waived and the effect of not waiving the excess coverage, and to provide an approved form for implementing a waiver. New § 541(h) provides that "[t]he amount of uninsured motorist coverage under a motor vehicle insurance policy may not exceed the amount of the liability coverage *under the same policy.* (Emphasis added). Subsection (f) of § 541 was left intact.

Unlike the situation in *Popham,* the Staabs had a single comprehensive policy, denoted as the "Kemper Insurance

Package," rather than two separate policies. The basic policy consisted of 34 pages, attached to which were several endorsements. Some of the endorsements provided coverage that is mandatory in Maryland; other endorsements provided optional coverages or conditions of one kind or another.

The basic policy contained four main Sections. Sections I and II provided homeowner insurance on the Staabs' residence. Section I afforded coverage for damage to the property up to a limit of $310,000; Section II provided up to $300,000 of personal liability protection. Section III of the policy provided automobile coverage for the Staabs' Volvo as follows:

Part A: liability coverage up to $300,000 per accident;

Part B: medical payment coverage;

Part C: uninsured motorist coverage up to the limit stated on the Declarations page, which was $300,000;

Part D: collision and comprehensive coverage for damage to the vehicle.

Section IV of the policy contained general policy conditions, none of which are especially relevant to the controversy now before us.

The uninsured motorist coverage included in Part C of Section III of the policy was replaced by an endorsement, denoted PP 0459, attached to the policy. The endorsement stated, among other things, that "the limit of liability shown in the Declarations for this coverage is our maximum limit of liability for all damages resulting from any one accident."

Another endorsement, denoted AK 3714, was a Personal Catastrophe Liability Endorsement. Under that endorsement, AMI agreed to pay "that portion of the damages for personal injury or property damage a covered person is legally responsible for which exceeds the retained limit." It is agreed that the "retained limit," as defined in the endorsement, means, with respect to automobile insurance, the $300,-000 provided for in Part A of Section III of the policy. The endorsement itself did not specify the limit of this excess coverage. Initially, the limit, as stated on the Declarations

page, was $1,000,000, but that was subsequently increased to $3,000,000.

The issue here is a simple one of whether, for purposes of § 541(f), the Personal Catastrophe Liability Endorsement is *a policy* having as its primary purpose to provide coverage in excess of other valid and collectible uninsured motorist coverage, as provided in § 541(c). If it is, then, under the principles announced in *Popham* and the present language of § 541, we would be obliged to affirm the judgment of the circuit court, for, in judging the obligation of AMI to provide uninsured motorist coverage equivalent to the amount of liability coverage, we would look only to the liability coverage afforded under the basic policy—Part A of Section III. Our conclusion, however, is that the endorsement is not such a policy. Rather, it is merely a part of the broader policy whose primary purpose is not so limited.

The nature of an endorsement was well described in 2 LEE R. RUSS AND THOMAS F. SEGALLA, COUCH ON INSURANCE 3D § 18:17 (1996):

> "A rider or endorsement is a writing added or attached to a policy or certificate of insurance which expands or restricts its benefits or excludes certain conditions from coverage. When issued in compliance with all requisites, it is a part of the contract to the same extent as if it were actually embodied therein, provided, of course, that it does not violate any statutory provision, and has been lawfully and sufficiently attached to the policy, or referred to in the policy, or both attached and referred to in the policy in accordance with local requirements.
>
> When properly incorporated into the policy, the policy and the rider or endorsement together constitute the contract of insurance, and are to be read together to determine the contract actually intended by the parties."

(Footnotes omitted.)

This is entirely consistent with the views we expressed in *Erie Ins. Exchange v. Gosnell,* 246 Md. 724, 731, 230 A.2d 467, 471 (1967), that, even when an endorsement is added subse-

quently, the original policy and the endorsement "are generally to be taken together as an integrated whole." *See also Rocks v. Brosius,* 241 Md. 612, 217 A.2d 531 (1966).

Endorsements come in a variety of forms. Some, as noted, simply alter policy language, coverage, conditions, or exclusions. Others, as in this case, provide new areas of coverage. We can find no basis, however, for drawing distinctions between them, treating some as separate policies and others as part of the policy to which they are attached or to which they relate. This is especially evident here. The premium charged for the Personal Catastrophe Liability Endorsement, though separately stated on the Declarations page (as were the premiums for automobile liability, medical payment, collision, and the homeowner's coverages), was part of the single premium charged for the policy. It provided a separate type of coverage, but so did the endorsement for primary uninsured motorist benefits.

AMI complains that the Staabs' approach essentially exalts form over substance. The endorsement, it urges, provides the same kind of excess liability coverage that would be provided by a separate policy and should therefore be treated no differently. We accept, as do the Staabs, that the endorsement serves much the same function and purpose as would be served by a separate "umbrella" policy. We are dealing here, however, not with what the law *ought* to be but with what it is.[2]

The Legislature has determined, as a general policy, that insureds should have the same amount of uninsured motorist coverage as they have automobile liability coverage, unless

---

**2.** Both parties have cited a number of cases from other jurisdictions involving "umbrella" policies generally or the extent to which the insurer is required, in such policies, to offer equivalent uninsured motorist coverage. None of those cases, factually, are directly on point. Moreover, they all hinge on statutory provisions that are different from § 541, and none involve the statutory language embodied in § 541(f). We have not overlooked the cases cited; we simply find them inapposite. This case must be determined on the basis of the Maryland statutory requirements.

they affirmatively waive the equivalent level over and above the mandatory minimum of $40,000. It has carved out an exception to that general policy, which it has expressed in precise language. In § 541(f), it has relieved an insurer, with respect to a policy having as its primary purpose the provision of excess coverage, from the burden of including equivalent excess uninsured motorist coverage absent a waiver. The insurer *may* include equivalent coverage, but it is not obliged to do so.

The Legislature could, of course, have worded the exception differently, to make it apply to "umbrella" endorsements included as part of a single, comprehensive policy. It did not. Perhaps the General Assembly was unaware that insurance companies either were including or intended in the future to include such excess coverages as endorsements; there is nothing that we could find in the legislative history of § 541(f) to indicate one way or the other. The fact is, however, that the language chosen is clear; it limits the exception in § 541(f) to "policies," not "endorsements," that have a special primary purpose.

However valiantly AMI may try to make it so, the endorsement in question is not, itself, a "policy." It is part of a broader, single, comprehensive policy that, for the most part, provides primary coverages for residential property damage and homeowner and automobile personal liability.[3] Because it is not, itself, a policy, much less a policy having excess coverage as its primary purpose, it does not fall within the purview of § 541(f). Notwithstanding its greater breadth, the endorsement supplements the coverage for automobile claims under Part A of Section III of the policy, and, to that extent, constitutes, for purposes of § 541(g), "liability coverage provided under the policy." Accordingly, absent a written waiver from the Staabs, AMI was obliged to provide equivalent

---

**3.** The Staabs received a single policy which, according to the Introduction page, consisted of the Declarations page, the policy booklet, and "any endorsements and amendments which we issue with your policy." There is not even a pretense that the Personal Catastrophe Liability Endorsement was a separate policy.

uninsured motorist coverage, and the policy must be construed as though it did.

JUDGMENT VACATED; CASE REMANDED TO CIR-CUIT COURT FOR BALTIMORE COUNTY FOR ENTRY OF DECLARATORY JUDGMENT IN CONFORMANCE WITH THIS OPINION; COSTS TO BE PAID BY APPEL-LEE.