783 A.2d 194

**Maria Angelique FISTER, Personal Representative of
the ESTATE OF Mary Gaye FISTER, et al.,**

v.

**ALLSTATE LIFE INSURANCE COMPANY.**

**No. 15, Sept. Term 2001.**

Court of Appeals of Maryland.

Oct. 12, 2001.

202

Jeffrey L. Forman (Bruce E. Kauffman and Forman, P.A., on brief), Towson, for petitioners.

Bryan D. Bolton (Michael R. McCann of Funk & Bolton, P.A., on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BATTAGLIA, Judge.

The petitioners, the beneficiaries of life insurance policies of the decedent, question the propriety of the Court of Special Appeals's reversal of the trial court's grant of summary judgment in petitioners' favor. The life insurance policies in question exclude coverage for death by suicide. Although the decedent unquestionably wanted to die, her attempts to kill herself failed, and she ultimately convinced a close friend to pull the trigger of a shotgun aimed at her head. The Circuit Court for Frederick County ruled that the insured's death was not a suicide and entered summary judgment in favor of petitioners. The respondent, Allstate Life Insurance Company (hereinafter "Allstate"), appealed and the Court of Special Appeals reversed, finding that Fister committed suicide because, as a matter of law, the term "suicide" must be interpreted from the perspective of the insured. Petitioners now challenge the decision of the Court of Special Appeals. We reverse the decision of the Court of Special Appeals and hold that summary judgment was properly granted. We conclude that the term "suicide" in Section 16–215 of the Insurance Article cannot be interpreted to include a death that occurs at the hands of another as the clear and unambiguous definition of the term "suicide" is to "intentionally take one's own life." Therefore, the decedent's death is not a suicide, and the beneficiaries are entitled to recover the proceeds of the life insurance policies.

## I. Background

### A. Facts

The parties stipulated to the relevant facts in this case. Of particular import, it is uncontested that in September of 1996, Mary Gaye Fister wished to die. During the months prior to her death, Fister left several messages with friends and

family, conveying her intention to end her life. Fister had incurred substantial debts, both in her personal life (including extensive gambling and consumer debt, as well as outstanding taxes owed to the Internal Revenue Service) and in her business life (Fister's business, Fister Accounting Services, Inc., defaulted on several bank loans and credit accounts), which totaled more than $1.2 million by the time of her death. In addition, in early September 1996, a criminal investigation was initiated concerning Fister's involvement in the marketing and sale of interests in a fictitious entity called the Delaware Physicians Investment Trust.[1]

Fister attempted, on several occasions, to find someone to kill her. She asked friends and a former boyfriend to assist her in either performing the task or finding someone who would. One of her closest friends, Lawrence Goldman, after repeatedly refusing to assist Fister, ultimately agreed to accompany her on September 10, 1996, when she resolved to kill herself. Fister and Goldman drove to a site on Baldwin Road in Monrovia, Maryland, with a 12 gauge shotgun that Fister had purchased a few days earlier. Fister told Goldman that her death could not appear to be a suicide because her life insurance policies excluded coverage in the event that the insured, Fister, commits "suicide." Therefore, intending to make it appear as though she was murdered, she asked Goldman to hold the shotgun to her head while she pulled the trigger. Fister had tied a string to the shotgun trigger housing so that she could pull the trigger while Goldman held and aimed the shotgun. Ms. Fister attempted to pull the string several times, but the shotgun did not discharge. According to Goldman, "[s]he kept pulling and pulling and pulling and then she started yelling at me saying, 'Let's do it! Let's do it! Let's do it!' She said, 'Larry, for the first time in your life, do something right, help me! Help me!' And before I knew it, I had pulled the trigger." After pulling the trigger, Goldman disposed of the gun and left the scene. Fister's body

---

1. The Delaware Physicians Investment Trust was a pyramid scheme in which Ms. Fister took money from new "investors" to pay off prior "investors."

was discovered by a police officer several hours later. Goldman was charged with first degree murder, and pled guilty to voluntary manslaughter, receiving an agreed upon sentence of five years imprisonment.

## B. Insurance Policies

Between November 1994 and May 1995, Allstate issued five separate life insurance policies, bearing an aggregate death benefit of $1,650,000, on the life of Mary Gaye Fister. Three of those life insurance policies are the subject of this appeal:[2] the beneficiary of Policy 792–832–862, issued in the amount of $1,000,000, is the Estate of Mary Gaye Fister (hereinafter "Estate"); the beneficiary of Policy 792–832–887, issued in the amount of $100,000, is Dorothy Winslow, the decedent's mother; the beneficiaries of Policy 792–980–072, issued in the amount of $200,000, are Lawrence Goldman and William Tad Cole. With respect to the latter policy, however, the contingent beneficiary is the Estate.[3]

Each of the Allstate policies contained the following exclusion to insurance coverage:

---

**2.** In addition to the petitioners, Anna P. Bussard and A.P. Bussard Revocable Trust were plaintiffs below. The trial judge had found in favor of Anna P. Bussard in the amount of $241,063, but found for Allstate with regard to the A.P. Bussard Revocable Trust because the policy naming the Trust as the beneficiary had lapsed for non-payment. While the appeal to the Court of Special Appeals was pending, Anna P. Bussard and the A.P. Bussard Revocable Trust entered into a settlement agreement with Allstate. Therefore, it is only the distribution of death benefits on the remaining three policies with which we are concerned: the Estate, as the beneficiary of both Policy 792–980–072 ($200,000) and Policy 792–832–862 ($1,000,000), and Dorothy Winslow, as the beneficiary of Policy 792–832–887. *See infra* note 3 (discussing the basis for naming the Estate the contingent beneficiary of Policy 792–980–072).

**3.** Mr. Goldman and Mr. Cole were listed as defendants in the initial proceeding because the Estate alleged that Goldman killed Fister and that Cole may have been an accessory either before or after the fact; as such, Goldman and Cole were disqualified from receiving life insurance benefits under Policy 792–980–072. An order of default was entered against Goldman and Cole; both men were disqualified as primary beneficiaries and the Estate was named the contingent beneficiary of Policy 792–980–072.

Suicide—If the insured dies by suicide while sane or insane within 2 years from the start date of the contract:

1) We will only pay a refund of the payments made; and

2) The contract will stop.

Notably, Fister's death is within the two year period from the date of issuance of each of the policies.

## C. Legal Proceedings

Petitioners filed a complaint against Allstate in the Circuit Court for Frederick County seeking to recover the death benefits under the life insurance policies covering Mary Gaye Fister.[4] Cross motions for summary judgment were filed by petitioners and Allstate. On February 17, 2000, the Circuit Court entered summary judgment in favor of petitioners. The court ruled that, because the term "suicide" was ambiguous, it must be construed as one would construe any ambiguous term in a contract, i.e. against the maker of that contract (Allstate). Therefore Fister's death could not be considered a suicide.

Allstate appealed to the Court of Special Appeals, arguing that Fister's death was a suicide because courts must view the term of contention, even though unambiguous,[5] from the per-

---

**4.** When the case was first filed, Allstate removed the action to the United States District Court for the District of Maryland, alleging that the petitioners fraudulently joined Goldman and Cole as defendants, *see supra* note 3, solely to prevent (federal) diversity jurisdiction. The petitioners moved to remand the case back to the State court, but this motion was denied.

As the facts were not in dispute, the parties filed cross-motions for summary judgment. The District Court granted Allstate's motion and ruled that Fister's death was a "suicide" thus invoking the suicide exclusion present in each life insurance policy. On appeal, the Unites States Court of Appeals for the Fourth Circuit reversed the judgment, ruling that the District Court lacked jurisdiction because Goldman and Cole were proper defendants, and directed a remand to the Circuit Court for Frederick County, Maryland. The Fourth Circuit did not reach the merits of the case.

**5.** Both parties agree that the trial court erred in finding the term "suicide" ambiguous, and on appeal to the Court of Special Appeals and this Court, contend that the term is *not* ambiguous.

spective of the insured. Allstate also argued that the slayer's rule precluded recovery by petitioners. The petitioners responded that once a court deems a statutory or contract term to be unambiguous, the analysis stops and courts must determine the rights of the parties based on that unambiguous definition; therefore, the petitioners are entitled to recover because, as a matter of law, Fister's death was not a suicide.

The Court of Special Appeals reversed the Circuit Court's judgment and remanded the case with directions to enter judgment in favor of Allstate. *Allstate Life Ins. Co. v. Fister,* 136 Md.App. 368, 765 A.2d 1024 (2001). The Court of Special Appeals agreed with the parties that the term "suicide" was unambiguous, but later held that "suicide" included instances where the decedent did not complete the final act herself. *Id.* at 379, 765 A.2d at 1030. The Court of Special Appeals further concluded that in considering whether the death was a suicide, it was required, as a matter of law, to view the matter from the perspective of the insured, i.e. Fister's perspective. *Id.* at 381–82, 765 A.2d at 1031. Thus, the Court held that for purposes of her life insurance policies, Fister died as a result of suicide, effectively canceling the death benefits under the policies. *Id.* at 382, 765 A.2d at 1031.

Petitioners sought, and this Court granted, a writ of certiorari to consider whether the definition of suicide, used both in statute and in contract, encompasses circumstances where the death of one, while clearly intended and desired, actually occurs at the hands of another. Because we conclude that the definition of "suicide" unambiguously entails the intentional taking of one's own life, we hold that, as a matter of law, Fister's death was not a suicide and petitioners are entitled to recover the benefits from the insurance policies.

## II. Standard of Review

Our review of a grant of summary judgment involves the determination of whether a dispute of material fact exists, *Mayor and City Council of Baltimore v. Ross,* 365 Md. 351, 359, 779 A.2d 380, 385 (2001); *Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 113, 753 A.2d 41, 47 (2000);

*Gross v. Sussex, Inc.,* 332 Md. 247, 255, 630 A.2d 1156, 1160 (1993), and whether the trial court's ruling was legally correct. *See Williams,* 359 Md. at 113–14, 753 A.2d at 47–48 (quoting *Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 204, 680 A.2d 1067, 1076 (1996)). Because the facts are undisputed, we are left to determine whether the trial court correctly interpreted and applied the relevant law to the uncontested facts. As with all questions of law, we review this matter *de novo. See Register of Wills for Baltimore County v. Arrowsmith,* 365 Md. 237, 249, 778 A.2d 364, 371 (2001).

### III. Discussion

 As with any contract, our interpretation of an insurance policy, its scope, and its limitations, involves discerning the terms of the contract itself. *See Cole v. State Farm Mutual Ins. Co.,* 359 Md. 298, 305, 753 A.2d 533, 537 (2000); *Kendall v. Nationwide Ins. Co.,* 348 Md. 157, 165, 702 A.2d 767, 771 (1997); *Chantel Assoc. v. Mount Vernon Fire Ins. Co.,* 338 Md. 131, 142, 656 A.2d 779, 784 (1995). Generally, when interpreting a contract's terms, our primary consideration is the "customary, ordinary, and accepted meaning" of the language used. *See Cole,* 359 Md. at 305, 753 A.2d at 537 (quoting *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.,* 324 Md. 44, 56, 595 A.2d 469, 475 (1991)).

 When the terms of the contract are derived from explicit statutory guidelines, however, the paramount consideration is interpreting the pertinent statutory provision. While the insurance policy contractually binds the parties in this case, the authority for implementing and utilizing the specific policy terms in question emanates from our State Legislature, and it is to their design to which we defer. *See Dutta v. State Farm Ins. Co.,* 363 Md. 540, 550–51, 769 A.2d 948, 954 (2001)(considering first, the extent to which PIP coverage was mandated by the State Legislature under Maryland Code, Title 19, subtitle 5 of the Insurance Article (1995, 1997 Repl.Vol.) when determining whether the petitioner was entitled to recover for emergency treatment under his automobile insurance policy); *Mutual Life Ins. Co. of New York v.*

*Ins. Comm'r*, 352 Md. 561, 574, 723 A.2d 891, 897 (1999) (concluding that terms in an insurance policy must comply with statutorily required obligations); *Staab v. American Motorists Ins. Co.*, 345 Md. 428, 436–437, 693 A.2d 340, 344 (1997) (stating that an insurance policy shall be construed to reflect any statutory requirements).

The Maryland Legislature enacted a provision which forbids insurance companies from excluding policy coverage for deaths caused in a specified manner *except* under five specific circumstances, of which suicide is one. The provision, now codified at Section 16–215 of the Insurance Article,[6] states:

(a) *Prohibited.*—Except as otherwise provided in this section, a policy of life insurance may not be delivered or issued for delivery in the State if the policy excludes or restricts liability for death that is caused in a specified manner or occurs while the insured has a specified status.

(b) *Exceptions.*—

(1) A policy of life insurance may contain a provision that excludes or restricts coverage for death under any of the following circumstances:

\* \* \*

(v) death that occurs within 2 years after the date of issue of the policy as a result of suicide while sane or insane.

Maryland Code, § 16–215 of the Insurance Article (1996, 1997 Repl.Vol.). To identify and effectuate the underlying legislative intent, the principal goal of statutory interpretation, we look first to the ordinary and plain meaning of the language of the statute. *See Derry v. State,* 358 Md. 325, 335, 748 A.2d

---

**6.** At the time the complaint was filed, this statute was codified at Maryland Code, Article 48A, § 410(a)(5)(1957, 1994 Repl.Vol.); however, by the Acts of 1996, Ch. 11, the section was re-codified without substantial change as Maryland Code, § 16–215 of the Insurance Article. In fact, this provision has remained essentially unchanged since its original enactment in 1956. *See* Maryland Code, Article 48A, § 189A (1957). We will refer to the provision by its present citation.

478, 483 (2000)(citing *Robinson v. State*, 353 Md. 683, 694, 728 A.2d 698, 703 (1999)). When the words are clear and unambiguous, according to their commonly understood meaning, our inquiry ordinarily ends. *See Mid–Atlantic Power Supply Ass'n. v. Pub. Serv. Comm'n of Maryland*, 361 Md. 196, 203–04, 760 A.2d 1087, 1091 (2000)(citing *Mayor & City Council of Baltimore v. Chase*, 360 Md. 121, 128, 756 A.2d 987, 991 (2000) and *Chesapeake and Potomac Tel. Co. of Maryland v. Dir. of Fin. for Mayor and City Council of Baltimore*, 343 Md. 567, 578, 683 A.2d 512, 517–18 (1996)).

The term of contention in the case *sub judice* is the word "suicide," which is left undefined by Section 16–215, and by the entire Insurance Article. In fact, despite use of the word in several different contexts throughout the Maryland Code,[7] the Maryland Legislature had never deemed it necessary to define "suicide" until 1999, when it enacted the Assisted Suicide Act. *See* Maryland Code, Art. 27 § 416 (1957, 1996 Repl.Vol., 2000 Supp.).[8] There, the Legislature defined "sui-

---

7. *See e.g.* Maryland Code, § 17–322.1(a)(2) of the Business Occupations and Professions Article (1989, 2000 Repl.Vol.); Maryland Code, § 7–501 of the Education Article (1978, 1999 Repl.Vol.); Maryland Code, § 4–212(c)(3)(iii) of the Health–General Article (1982, 2000 Repl.Vol.); Maryland Code, § 5–614(a) of the Health–General Article (1982, 2000 Repl.Vol.); Maryland Code, § 7–207(a)(3)(ix) of the Health General Article (1982, 2000 Repl.Vol.); Maryland Code, § 16–106(b)(3)(ii) of the Insurance Article (1996, 1997 Repl.Vol.); Maryland Code, § 18–109(b)(8)(iv) of the Insurance Article (1997, 1997 Repl.Vol.); Maryland Code, § 2–120(a)(2) of the Real Property Article (1974, 1996 Repl.Vol., 2001 Supp.); Maryland Code, Art. 83C § 2–122(a)(2), (b)(2)(i)(3), (b)(2)(i)(6)(D) (1957, 1998 Repl.Vol.).

8. The Assisted Suicide Act, itself, gives support to the homicide/suicide distinction we find ourselves reinforcing today. The Act provides that a person may not:

(1) Knowingly cause, by coercion, duress, or deception, another person to commit suicide or to attempt to commit suicide;
(2) Knowingly provide the physical means by which another person commits or attempts to commit suicide with knowledge of the person's intent to use the physical means to commit suicide; or
(3) Knowingly participate in a physical act by which another person commits or attempts to commit suicide.
Code, Art. 27 § 416(b).

cide" as "the act or instance of intentionally taking one's own life." *Id.*

We believe that the plain and ordinary meaning of the word, and the definition recently set forth by the Legislature, are synonymous and unequivocally unambiguous. Suicide is the intentional taking of one's own life, i.e. by his or her own hands. In discussing similar suicide exclusion clauses, we have historically used terminology such as "taking one's own life," *Ins. Co. of North America v. Aufenkamp,* 291 Md. 495, 504, 435 A.2d 774, 779 (1981), and "death ... by his own hand or act," *Knickerbocker Life Ins. Co. v. Peters,* 42 Md. 414, 421 (1875), to describe suicide. One's desire to die, but failure to accomplish the act, does not mean that another person's successful completion of the act is still considered suicide. Suicide requires more than simple thought, and more than elaborate planning; it requires conduct—an act which consummates the intent—as it is generally the actor's ultimate conduct to which we look when determining responsibility.

Fister did not commit suicide because she did not take her own life; rather, another person, exercising his own free will, was ultimately responsible for her death. The operation of this independent free will acts as an intervening cause of Fister's death. Despite her pronounced and unquestionable desire to die, and her uncontested, disreputable, and even fraudulent motives in seeking to make her death appear

---

It is a crime under this statute to "assist" another in *killing himself or herself,* whether by coercion, participation, or providing the physical means to do so. Allstate asserts that the only reason Goldman could not have been charged or convicted of assisted suicide is because the Act was enacted years after Fister's death. We disagree; notwithstanding that the Act was not in effect at the time of Fister's death, Goldman could not have been charged or convicted under the Act because he did not *assist another* under the terms of the Act. A single deviation in the fact pattern makes this point clear: Had Goldman only held the shotgun while Fister pulled the trigger, this could have been construed as participation "in a physical act by which another person commits or attempts to commit suicide." Art. 27 § 416(b)(3). By pulling the trigger, however, Goldman has no longer "assisted" a person in killing herself. Rather, he has killed her by his own hands; and this, the law declares, is homicide.

as a murder for purposes of assuring that her beneficiaries receive insurance policy proceeds, Fister's death was undeniably the result of a homicide. A conscious, thinking human being, who was in no immediate danger or peril, made a choice to pull the trigger. As a result of that independent choice, Fister died.

Along those lines, the Court of Special Appeals mentioned an unsubstantiated psychological theory described as "suicide by cop" in footnote 5 of its opinion. According to this theory, when a person intentionally provokes the police to use deadly force, he or she has committed "suicide by cop." 136 Md.App. at 379 n. 5, 765 A.2d at 1030 n. 5.[9] The Court of Special Appeals adduced this theory to support its assertion that "[t]he accepted definition of suicide does not mandate that the decedent carry out the final act in order for his or her death to be considered suicide." 136 Md.App. at 379, 765 A.2d at 1030. It is worthy of note that none of the jurisdictions cited by the Court of Special Appeals adopted this "theory" as an extension of the legal definition of suicide; rather, this theory was only raised in reference to witness testimony concerning the psychological state of one of the parties to the case. Furthermore, the commonly understood definition of suicide simply does not encompass actions taken by another. To use the example offered by the Court of Special Appeals: when one incites a police officer to use deadly violence, we are either presented with justifiable homicide, if the officer's use of deadly force is found to be reasonable, or simple homicide, if the officer's use of deadly force is unreasonable. But, under neither circumstance are we presented with suicide, for the death occurred at the hands of another.

This Court does not stand alone in declaring the meaning of "suicide" unambiguous; in fact, the term "suicide" was de-

---

**9.** The Court of Special Appeals cited the following cases when discussing this unsubstantiated theory: *Hainze v. Richards,* 207 F.3d 795, 797 n. 1 (5th Cir.2000), *cert. denied,* 531 U.S. 959, 121 S.Ct. 384, 148 L.Ed.2d 296 (2000); *Medeiros v. O'Connell,* 150 F.3d 164, 167 n. 1 (2nd Cir.1998); *Adams v. City of Fremont,* 68 Cal.App.4th 243, 80 Cal. Rptr.2d 196, 199 (1st Dist.1998).

clared to be unambiguous by the Court of Special Appeals, and was stipulated as such by both parties in this case. The question then becomes, how could the term suicide, under its ordinary and commonly understood definition, legitimately be interpreted to include a not-so-ordinary and not-so-common action, i.e. the pulling of the trigger by someone other than the alleged "suicide" victim. The answer is found in the Court of Special Appeals's erroneous application of the principles of contract (insurance policy) interpretation that we set forth in *Cole v. State Farm Mutual Ins. Co.*, 359 Md. at 305, 753 A.2d at 537 (2000).

 *Cole, supra,* involved this Court's attempt to discern whether the event-the shooting and killing of Ms. Cole while seated in her parked van-constituted an "accident" for purposes of recovering insurance proceeds under her automobile policy. First, we note that, contrary to the case before us today, our decision in *Cole* was not guided or constrained by any statutory construct; rather, the *Cole* decision was based solely on contract interpretation. Second, and again, contrary to the present case, the premise for the principles of interpretation established in the *Cole* decision was the *ambiguity* surrounding the word "accident." Both parties in *Cole* agreed on the textual definition of "accident," i.e. that under Maryland law, "accident" is defined as "a happening; an event that takes place without one's foresight or expectation; an event which proceeds from an unknown cause, or is an unusual effect from a known cause, and therefore not expected." 359 Md. at 307, 753 A.2d at 538 (quoting *Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.*, 248 Md. 148, 151, 235 A.2d 556, 557 (1967) (citations omitted)). The parties disagreed, however, on through whose eyes one should analyze whether the event took place "without foresight or expectation." *See id.* State Farm argued that the shooting of Ms. Cole was an intentional, foreseen, and anticipated act on the part of the killer; not an "accident" under the terms of the company's insurance policy. Ms. Cole's estate argued that the event was completely unexpected and unforeseen, from the perspective of Ms. Cole, and thus, qualified as an "accident" for purposes of recovering

insurance benefits. We made clear that this distinction, resulting from the *ambiguity* in interpretation, was critical. *See id.* To resolve this distinction, we turned to long-standing guidelines of contract interpretation. We explained:

> If the meaning of the terms of the insurance policy are plain and unambiguous, we will determine the meaning of the terms of the contract as a matter of law. If the terms are ambiguous, however, we will look to evidence from extrinsic sources such as dictionaries or an interpretation of the term employed by one of the parties before the dispute arose. A term of a contract is ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning.

359 Md. at 305–06, 753 A.2d at 537 (internal citations omitted).

 Thus, only when a term is reasonably susceptible to more than one meaning, do we consider extrinsic evidence. *See Bushey v. Northern Assurance Co. of America,* 362 Md. 626, 632, 766 A.2d 598, 601 (2001)(stating that, *"[w]here terms are ambiguous,* extrinsic and parole evidence may be considered to ascertain the intention of the parties")(emphasis added). Suicide is not such a term. Nor is its definition—the intentionally taking of one's own life—reasonably susceptible to more than one meaning. Another person's involvement in *causing* the death of another cannot reasonably be construed as suicide. In this case, Goldman held a shotgun to Fister's head and ultimately pulled the trigger, *causing* Fister's death. This is homicide, not suicide. Therefore, we enforce the insurance policy by faithfully and strictly adhering to its unambiguous terms, the very same (unambiguous) terms authorized by the State Legislature. *See Dutta,* 363 Md. at 556, 769 A.2d at 957 (explaining that "if no ambiguity in the terms of the insurance contract exist, a court has no alternative but to enforce those terms")(citing *Kendall,* 348 Md. at 171, 702 A.2d at 773).

 Although the Court of Special Appeals agreed that the term "suicide" was unambiguous, it sought to include actions in the definition which did not fall within the *unambiguous* scope of the term. The Court of Special Appeals stated,

"[w]e believe that the term 'suicide' encompasses the instance in which an individual intends to end his or her own life and takes all of the necessary steps toward ending his or her life, with the exception of the final act," because "[t]he accepted definition of suicide does not mandate that the decedent carry out the final act in order for his or her death to be considered a suicide." 136 Md.App. at 379, 765 A.2d at 1030. The Court further concluded that, "the only logical way to determine whether a death was a suicide, i.e. occurred pursuant to the insured's own free volition and intent, is from the perspective of the insured." *Id.* at 381, 765 A.2d at 1031.

We disagree. The accepted definition of suicide mandates that the decedent take his or her own life. The Court of Special Appeals essentially concedes that the commonly understood meaning of the term "suicide" should be applied, yet it simultaneously declares that an element of this "unambiguous term" should be ignored, namely that the "final act" is not necessary to constitute a "suicide." By removing, from the definition of "suicide," the *act* itself, i.e. the physical *taking of one's own* life, the court purports to consider only the "free volition and intent" of the deceased, which effectively alters the commonly understood meaning of suicide.[10] *See id.* The Court of Special Appeals created an ambiguity in the application of the unambiguous term "suicide" in order to avoid an undesirable result.[11] As we have oft stated, a court may not

---

**10.** The danger of accepting an intent-based standard for suicide is clear: If such reasoning were to stand, insurance companies, so as to avoid paying death benefits, could argue, with relative ease and minimal evidence, that the decedent was dissatisfied with his or her life (i.e. the presence of some outstanding debt and a depressed letter to a friend) and, to some degree, voluntarily participated in the act which resulted in his or her death (i.e. even if the decedent only negligently, for instance, walked in front of a bus).

**11.** We acknowledge Judge Eldridge's concurrence and agree that if the *application* of the term "suicide" were deemed to be ambiguous, as our esteemed colleague finds it to be, the term "suicide" would be construed against the drafter of the policy, i.e. Allstate, pursuant to our long-standing principles of insurance policy interpretation and the same result would apply. *See Bushey*, 362 Md. at 632, 766 A.2d at 601

create ambiguity or uncertainty where none otherwise exists. *See Sears Roebuck & Co. v. Gussin,* 350 Md. 552, 564, 714 A.2d 188, 193 (1998); *see also Philip Electronics North America v. Wright,* 348 Md. 209, 217, 703 A.2d 150, 154 (1997); *Marzullo v. Kahl,* 135 Md.App. 663, 672–673, 763 A.2d 1217, 1222 (2000), *cert. granted,* 363 Md. 661, 770 A.2d 169 (2001)(stating that a court must never "embellish a statutory provision so as to enlarge its meaning")(quoting *Abington Ctr. Assocs. Ltd. v. Baltimore County,* 115 Md.App. 580, 603, 694 A.2d 165, 176 (1997)). No reasonable uncertainty may be found in the application of "suicide" to the case at hand; the scope of the word "suicide" is limited by its unambiguous definition—it cannot include conduct which contradicts the very nature or definition of the term.

 Allstate also contends that the slayer's rule precludes the petitioners from recovering the death benefits. Under the slayer's rule, embodied in Maryland common law, a beneficiary of a life insurance policy may not recover under the policy if she is responsible for bringing about the death of the insured. *See Diep v. Rivas,* 357 Md. 668, 676, 745 A.2d 1098, 1102 (2000)(quoting *Schifanelli v. Wallace,* 271 Md. 177, 188, 315 A.2d 513, 519 (1974)); *Ford v. Ford,* 307 Md. 105, 107–12, 512 A.2d 389, 390–93 (1986). The rule is designed to prevent one from profiting by his or her crime. *Diep,* 357 Md. at 677, 745 A.2d at 1102. Allstate argues that by allowing Fister's estate to recover the death benefits, the slayer, i.e. Fister, would benefit from the commission of her crime. If a wife who solicits the murder of her husband is prohibited from collecting the insurance proceeds, Allstate argues, then one who solicits her own death should be prohibited from collecting the proceeds. This argument is flawed and requires an

---

(stating that while "Maryland does not follow the rule ... that an insurance policy is to be construed most strongly against the insurer ... if no extrinsic or parol evidence is introduced, or if ambiguity remains after consideration of the extrinsic or parole evidence that is introduced, it will be construed against the insurer as the drafter of the instrument")(quoting *Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 766–67, 556 A.2d 1135, 1138 (1989)).

unjustifiable extension of the slayer's rule. As mentioned, the rule is intended to preclude a "slayer" from benefitting from the killing of another. Neither of the petitioners, i.e. the decedent's mother, independently, and the decedent's daughter, as personal representative of the estate, was responsible for the death of Fister,[12] and neither solicited Fister's death. Furthermore, it is illogical to view Fister, herself, as the "beneficiary" of her own life insurance policies. A decedent and a beneficiary of a life insurance policy cannot one person be.

Neither through statutory construct, nor through contract interpretation, can we justify broadening the plain and ordinary definition of the word "suicide." Just as we seek to avoid farfetched interpretations of statutes, *see e.g. Frost v. State,* 336 Md. 125, 137, 647 A.2d 106, 112 (1994), so do we wish to avoid interpreting contract language between two parties in a manner that is void of a commonsensical perspective. This Court will "neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used;" nor will we "engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Taylor v. NationsBank, N.A.,* 365 Md. 166, 181, 776 A.2d 645, 654 (2001). We are being asked to rewrite the statute and contract so as not to offend notions of fair play, or so as to achieve that which is, at least from the perspective of the insurer, the fair result. We refuse. It is the province of the State Legislature, not the courts, to expand the scope of insurance policy exclusions under Section 16–215.[13] Upon concluding that the clear and unambiguous

---

12. *See supra* note 3 (discussing the basis for naming Goldman and Cole as defendants in the petitioners' suit for the death benefits; petitioners alleged that Goldman and Cole should be precluded from receiving the benefits from the insurance policy in which they were named primary beneficiaries because Goldman ultimately killed Fister, and Cole was an alleged accessory).

13. Pursuant to Section 16–215(d), the insurance company could, itself, provide more extensive protection to the policy holder than that which is designated by the State Legislature. Section 16–215(d) states: "This

definition of the term "suicide" is to "intentionally take one's own life," and cannot be interpreted to include a death that occurs at the hands of another, we hold, as a matter of law, that Fister's death was not a suicide. Therefore, petitioners are entitled to recover the proceeds of the life insurance policies.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*

Judge ELDRIDGE, concurring:

I concur in the judgment but not in the Court's reasoning. I would agree that the word "suicide," as applied in most circumstances, is not ambiguous. Nevertheless, in the context of the present case, the term does seem to be ambiguous.

I would not in this case decide whether the word "suicide" in § 16–215 of the Insurance Article covers the factual situation here presented. The life insurance policies issued by Allstate do not define the term "suicide" as used in the exclusions to coverage. It is a settled principle that "ambiguity in the language" of an insurance policy "should be construed against the party preparing it," *Truck Ins. Exch. v. Marks Rentals,* 288 Md. 428, 435, 418 A.2d 1187, 1191 (1980). Since, in the context of this case, the term "suicide" in the insurance policies is ambiguous, and since the insurer drafted the policies, I would resolve the ambiguity against Allstate.

---

section does not prohibit any policy provision that in the opinion of the Commissioner is more favorable to the policyholder than a provision allowed by this section." *See* Maryland Code, § 16–215(d) of the Insurance Article (1996, 1997 Repl.Vol.). Allstate's position, if accepted, would not provide the insured with greater protections, but rather, would expand the scope of the suicide exclusion, and thus provide the insured with less coverage than the statutory scheme allows.